## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Achaogen, Inc., | Case No. 19-10844 (BLS) |
| Debtor.[1] | |
| Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust, | Adv. Pro. No. _____ |
| Plaintiff | |
| v. | |
| Cipla USA Inc., | |
| Defendant. | |

## ADVERSARY COMPLAINT FOR DAMAGES

NOW COMES Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust ("Trustee" or "Plaintiff"), and files this adversary complaint (the "Complaint") seeking damages and other relief against Cipla USA Inc. ("Cipla" or "Defendant"), the Defendant herein.[2] In support, the Trustee states as follows:

### Nature of the Action

The Trustee brings this action for damages against Cipla, based on Cipla's submission and subsequent repudiation of irrevocable bids to purchase certain assets from Achaogen, Inc. ("Achaogen" or "Debtor") while Achaogen was in bankruptcy. Cipla refused to honor its obligations to purchase certain Achaogen assets and, in doing so, undermined an orderly

---

[1] The last four digits of Achaogen's federal tax identification number are 3693. The last four digits of the Achaogen Plan Trust's tax identification number are 4172.

[2] All Exhibits and documents cited in this Complaint are expressly incorporated herein.

bankruptcy process by delaying and ultimately failing to consummate its respective, agreed-to transactions. Specifically, Cipla intentionally walked away from its bids to acquire (i) rights in China to a drug known as Plazomicin, and (ii) the global rights to a separate drug known as C-Scape. After Cipla was deemed the Successful Bidder and Back-up Bidder, as applicable, Cipla chose to walk away from its irrevocable obligations.

As a result, Cipla left Achaogen, a debtor-in-possession with limited liquidity, to endure unnecessary costs while in bankruptcy and without a definitive purchaser of such assets. Achaogen, for its part, relied on Cipla's representations and contractual agreements, and decided to forego alternate opportunities to sell its assets. By its conduct, Cipla took advantage of the bankruptcy process and attempted to avoid its duties and obligations under various agreements and court orders intended to allow Achaogen to liquidate its assets and successfully emerge out of bankruptcy.

## **Statement of the Case**

1.      On April 15, 2019 (the "Petition Date"), Achaogen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code[3] commencing this case (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      Between the Petition Date and May 29, 2020, Achaogen operated its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was formed and was appointed in the Chapter 11 Case on April 23, 2019.

---

[3] Capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Bidding Procedures, the Bidding Procedures Order, the Cipla Sale Agreements and/or the Cipla Sale Order (as such terms are defined below), as applicable. Copies of the foregoing are publicly available on this Court's docket for *In re Achaogen, Inc.*, Case No. 19-10844 (BLS).

3. On May 29, 2020, the Court approved an order (the "<u>Confirmation Order</u>") confirming the *First Amended Plan of Liquidation Jointly Proposed by Achaogen, Inc. and the Official Committee of Unsecured Creditors of Achaogen, Inc.* (the "<u>Plan</u>").

4. On May 29, 2020, and pursuant to the Plan and Confirmation Order, the assets of Achaogen were vested in the Achaogen Plan Trust and Plaintiff was appointed as Plan Trustee of the Achaogen Plan Trust.

## Jurisdiction and Venue

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b).

6. Venue of this proceeding is proper in this Court pursuant to 28 U.S.C. § 1409.

7. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## Parties

8. The Trustee was appointed as Plan Trustee of the Achaogen Plan Trust which was created and is governed by the Plan, Confirmation Order and Plan Trust Agreement.

9. Cipla is a corporation incorporated in Delaware.

## Background

### A. Achaogen was Focused on Developing Crucial Anti-Infective Drugs

10. Achaogen was a pharmaceutical company that developed and commercialized drugs to fight drug-resistant "superbugs" – bacterial infections that are resistant to treatment by even the most potent available antibiotics.

11.     The explosion of antibiotic-resistant bacteria is widely viewed as one of the most serious threats facing the global population.[4] For years, doctors have utilized a class of antibiotics known as aminoglycosides to successfully treat serious bacterial infections. Aminoglycosides work by inhibiting bacterial protein synthesis, and are especially effective against gram-negative bacteria.[5] Certain bacteria, however,—commonly known as "superbugs"—have developed or inherited resistance mechanisms that can inactivate the anti-bacterial properties of the commonly prescribed aminoglycosides. This "drug-resistance" renders even the most common bacteria deadly.

12.     By April 2019, Achaogen had developed two anti-infective drugs. The first, an IV anti-infective drug known as ZEMDRI® ("Plazomicin"), received FDA approval in June 2018. Plazomicin is specially formulated to "resist" the resistance mechanisms of many types of gram-negative bacteria, such that it can effectively kill bacteria that are resistant to other, more commonly used anti-infective agents. It is particularly effective against a specific group of gram-negative bacteria called Enterobacteriaceae — bacteria that both the Center for Disease Control and the World Health Organization have identified as a public health threat.

13.     The second, an orally administered antibiotic for treatment of complicated urinary tract infection caused by drug-resistant bacteria known as "C-Scape" ("C-Scape"), was late in the Phase I approval process when Achaogen filed for bankruptcy.

14.     Plazomicin, and eventually C-Scape, were Achaogen's primary anticipated sources of revenue while the company was operational.

---

[4] *See* https://www.cdc.gov/drugresistance/biggest-threats.html (last visited Apr. 29, 2021).

[5] Gram-negative bacteria are bacteria that do not retain the crystal violet stain used in the gram-staining method of bacterial differentiation. All bacteria are classified as either Gram-negative or Gram-positive based on the characteristics of their outer membrane or cell wall.

15.     Recognizing that drug-resistant bacteria are a threat to both public health and national security, the United States government has taken a keen interest in combatting drug-resistant bacteria.[6] To that end, the federal government has allocated significant funding to support the efforts of (usually small) drug companies like Achaogen to develop new anti-infectives to fight these pathogens.  Recognizing the potential of Achaogen's drugs, the Biomedical Advanced Research and Development Authority ("BARDA") provided Achaogen with over $120 million in funding for the development of Plazomicin and C-Scape.

16.     Soon after the FDA approved Plazomicin for commercial use — and notwithstanding that it had a $1 billion market cap in 2017 — Achaogen found itself in a perilous financial position.  The costs associated with sustaining production and marketing capabilities, as well as the costs of maintaining an R&D team that can produce a robust pipeline of drug candidates, are often higher than revenues for smaller companies such as Achaogen.

17.     As a result, liquidity issues rapidly became Achaogen's reality.  Although its forecasts indicated that, over time, the revenues generated from Plazomicin would lead to profitability, commercializing the drug proved to be too costly.  Ultimately, a sale of Achaogen's assets was the only way to ensure that Plazomicin was available to those patients who desperately needed it, and that its drug pipeline—including most notably C-Scape—remained intact.  Given its dire financial state, Achaogen filed for chapter 11 relief on April 15, 2019.

---

[6]    *See*    https://www.pewtrusts.org/en/research-and-analysis/articles/2019/02/01/fight-against-superbugs-crucial-to-americas-biodefense (last visited Apr. 29, 2021) (where Rick Bright, the director of BARDA, explains that drug-resistant bacteria "can complicate soldiers' wounds, exacerbate casualties associated with both natural and manmade emergencies, and can be weaponized by our nation's enemies.").

**B.      Achaogen Obtained Approval to Auction its Assets and Solicit Bids**

18.      To facilitate a sale during the pendency of the chapter 11 proceedings, Achaogen filed a motion seeking court approval of its bidding procedures (the "Bidding Procedures") on the Petition Date [D.I. 30].  A copy of the Bidding Procedures is attached hereto as **Exhibit A**.

19.      By order entered May 1, 2019, this Court approved the Bidding Procedures in all material respects, allowing Achaogen to solicit the highest and best offers to purchase all or substantially all of its assets [D.I. 123] (the "Bidding Procedures Order").  A copy of the Bidding Procedures Order is attached hereto as **Exhibit B**.

20.      Consistent with the terms of the Bidding Procedures Order, the following deadlines were set: (i) submission of bids for all or substantially all of Achaogen's assets by May 29, 2019 (the "Bid Deadline")[7] and (ii) an auction of Achaogen's assets by no later than June 3, 2019.

21.      To ensure that any Qualified Bids remained open, irrevocable, and binding, the Bidding Procedures Order included, by reference, the following language: "all Qualified Bids shall remain open and irrevocable until the earlier of:

> if such bid is chosen by Achaogen to be the Back-up Bid, the date which is the earlier to occur of: (i) the date of closing on the Sale to the Successful Bidder, and (ii) twenty-five (25) Business Days following the date the order approving the Sale to the Successful Bidder shall have become a Final Order; **provided, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets during the period set forth above, (x) the Back-up Bid shall continue to remain open and irrevocable, (y) the Back-up Bidder shall be deemed to be the Successful Bidder, and (z) it shall close on the Sale within ten (10) Business Days of becoming the Successful Bidder**;"

Exhibit A, Article IV(J)(3) (emphasis added).

22.      Since their inception, Plazomicin and C-Scape generated much interest in the pharmaceutical industry.  After the Petition Date, Achaogen's investment banker, Cassel Salpeter

---

[7] The bid deadline was ultimately extended to May 30, 2019 with the consent of Achaogen, the Committee and Silicon Valley Bank, N.A. (the "DIP Lender").

& Co LLC ("Cassel") contacted 192 potential buyers, including 154 strategic buyers and 38 financial buyers. 64 interested parties were active in the data room, which contained more than 1,000 accessible documents.

23. During this diligence process it became clear that many potential bidders were interested in some, but not all, of Achaogen's assets. Specifically, certain parties were interested in bidding on the rights to Plazomicin in certain territories as opposed to purchasing the global rights at a higher price.

C. **Achaogen Conducted the June 3 Auction of Rights in Plazomicin**

24. Achaogen commenced an auction for the sale of its assets on June 3, 2019 (the "June 3 Auction"). The June 3 Auction was for substantially all assets other than C-Scape.

25. Cipla submitted an initial bid comprised of an offer of ▮▮▮▮▮▮ for the global rights to Plazomicin, including related patents, trademarks, domain names, contracts, government approvals and certain other related assets and to assume certain liabilities of Achaogen (collectively, the "Global Rights"). This bid was selected to serve as the Baseline Bid to start the auction. A copy of Cipla's bid is attached hereto as **Exhibit C**.

26. While no parties appeared able or interested in topping Cipla's bid for the Global Rights, Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") submitted a bid for a perpetual, irrevocable, exclusive, royalty-and-milestone-payment-free, and sublicensable license of the rights to develop, commercialize and manufacture the compound and the product of Plazomicin in the People's Republic of China, Hong Kong, Macau and Taiwan (the "China Assets"). A copy of Qilu's bid package is attached hereto as **Exhibit D**.

27. Due to the expressed interest of several parties in rights within different territories, it became evident at the June 3 Auction that bidders interested in the rights to Plazomicin could

potentially put forth a collective bid higher than that of Cipla. This is exactly what happened. Altamont Pharma Fund II, LLC ("Altamont"), who initially submitted a bid for the Global Rights, modified its bid so that it was now only challenging Cipla for the Global Rights other than the China Assets.

28.     As a result of Altamont's modified bid, the combination of the bids of Altamont and Qilu collectively represented an offer for the Global Rights that was higher and better than Cipla's bid. At a certain point during the June 3 Auction, rather than continue to bid on the Global Rights as one asset, Cipla decided to split its bid by territory in an effort to outbid Altamont and Qilu separately. Thus, Cipla divided its global bid into bids for (i) the Global Rights except for the China Assets, and (ii) the China Assets.

29.     By submitting split bids, Cipla risked an outcome whereby it would be obligated to purchase the Global Rights subject to a license for the China Assets.

30.     While Cipla outbid Altamont, it did not outbid Qilu for the China Assets. After multiple rounds of bidding, Achaogen, in consultation with the DIP Lender and the Committee, designated (i) Cipla's bid of $4.65 million[8] as the Successful Bid for the Global Rights subject to a license agreement for the China Assets and (ii) Qilu's bid of $8.5 million as the Successful Bid for the China Assets. Cipla's bid of $8.4 million was designated as the Back-up Bid to Qilu's winning bid for the China Assets.

31.     It was agreed and understood by the parties at the June 3 Auction that Qilu was to receive a perpetual, irrevocable, exclusive, and royalty-free license, with the right to grant sublicenses for the China Assets (the "Qilu License Agreement").

---

[8] In addition to this upfront cash consideration, Cipla's winning bid was also comprised of (i) the assumption of certain contractual liabilities and (ii) additional contingent consideration, including non-contingent guaranteed minimum payments equaling $2.7 million over the next 10 years.

32.     To facilitate the transactions with Cipla and Qilu for their separate rights related to Plazomicin, Achaogen, after consummating the Qilu License Agreement, would assign the license agreement to Cipla.  This understanding was agreed and understood by the parties at the June 3 Auction and memorialized in the Cipla Plazomicin Sale Agreement and Cipla Sale Order (as both terms are defined in paragraphs 34, 64).  Therefore, because Cipla would eventually become the ultimate licensor of the rights to Plazomicin in the Greater China Region, the negotiation of the Qilu License Agreement required the participation of all three interested parties: Achaogen, Qilu and Cipla.

33.     Cipla, for its part, got what it bargained for over the course of the 18-hour auction. It chose to forego a consolidated bid for the global rights to Plazomicin and instead submitted two separate and independent bids that did not guarantee that it would ultimately obtain the right to monetize Plazomicin globally.  Thus, its duty to participate in the negotiation of a comprehensive license agreement for the China Assets in favor of Qilu was solely attributable to its decision to split its bids when it could have bid on and won complete global rights to Plazomicin.

D.      **Achaogen, Cipla and Qilu Attempted to Negotiate the Qilu License Agreement**

34.     As part of the Qilu License Agreement negotiations, and consistent with the terms agreed to by the parties at the June 3 Auction and memorialized in the asset purchase agreement dated June 20, 2019 between Achaogen and Cipla for the Global Rights (subject to the Debtor's right to license the China Assets) (the "Cipla Plazomicin Sale Agreement") [D.I. 371-1], attached hereto as **Exhibit E**, Cipla agreed to "execute and deliver to [Achaogen] and [Qilu], an assignment and assumption agreement, in form and substance reasonably satisfactory to [Achaogen] and [Cipla], pursuant to which [Achaogen] will assign, and [Cipla] will assume, all rights and obligations of [Achaogen] under the [Qilu] License Agreement."  Exhibit E §5.17(b).  Moreover,

Cipla agreed to negotiate the Qilu License Agreement "in good faith and use commercially reasonable efforts to finalize the [Qilu] License Agreement on terms reasonably acceptable to [Cipla] as soon as reasonably practicable following the date hereof." *Id*. at §5.17(e).

35.     Cipla's involvement and input was essential to the consummation of the Qilu License Agreement as it was now the holder of the Global Rights (subject to the Debtor's rights to license the China Assets) following the consummation of the Cipla Plazomicin Sale Agreement and eventual licensor of the China Assets to Qilu.

36.     During negotiations, Achaogen served as the facilitator of discussions between Cipla and Qilu regarding the Qilu License Agreement.  The goal was to have the Cipla Sale Agreements and Qilu License Agreement close at or about the same time; however, Cipla's actions (and inactions) rendered this goal impossible.

37.     On June 4, 2019, Achaogen sent Qilu's draft of the license agreement ("<u>Qilu's Draft License</u>") that Qilu had submitted with its bid to Cipla for review.  Despite several requests by both Achaogen and Qilu for Cipla's comments on an expedited basis, Cipla did not revert with comments until June 17, 2019 ("<u>Cipla's Draft License</u>").

38.     The Cipla's Draft License was remarkably different from the Qilu Draft License.  Among other changes, Cipla removed several rights afforded to Qilu in the Form License Agreement including: (i) a perpetual license, (ii) the right to sublicense the China Assets, (iii) the right of reference to licensor regulatory documentation, (iv) ownership of China Plazomicin trademarks and (v) the ownership of inventions developed by Qilu.

39.     On June 18, 2019, upon its review of Cipla's Draft License, Qilu's counsel communicated to Achaogen through email its displeasure with the extensive changes made in Cipla's Draft License.  *See* **<u>Exhibit F</u>**.  Qilu's counsel claimed that Cipla's Draft License "greatly

deviated from the draft provided by [Achaogen] and have drastically taken back what was offered for sale by Achaogen." *Id*. Further, Qilu's counsel expressed concerns that Cipla may not be negotiating in good faith in light of its overly aggressive markup of Qilu's Draft License. *Id*.

40. From Qilu's perspective, Cipla "abused" the opportunity to be part of the Qilu License Agreement negotiations by substantially rewriting key sections of Qilu's Draft License. While Cipla claimed that it was prepared to assist Achaogen and Qilu to consummate the Qilu License Agreement, Cipla's actions rendered its words merely empty promises.

### E. Achaogen Conducted the June 12 Auction of Rights in C-Scape

41. Achaogen, in consultation with the DIP Lender and the Committee, held a separate auction for the sale of C-Scape. The auction for C-Scape took place on June 12, 2019 (the "June 12 Auction" and collectively, with the June 3 Auction, the "Achaogen Auctions").

42. Cipla was one of two bidders interested in C-Scape. Much like its bid for the Global Rights, the documentation that accompanied Cipla's C-Scape bid also presented numerous issues for Achaogen. Upon informing Cipla of these issues, Cipla elected to participate in the June 12 Auction with the understanding that if its bid was selected as the Successful Bid, it would be subject to further negotiation of final documentation.

43. At the conclusion of the June 12 Auction, Achaogen, upon consultation with the DIP Lender and the Committee, designated (i) Cipla, who submitted a bid of $1,050,000, as the Successful Bidder for C-Scape and (ii) Vipragen Biosciences Private Ltd., who submitted a bid of $1,025,000, as the Back-up Bidder for C-Scape.

44. Although Achaogen selected Cipla as the Successful Bidder for C-Scape, with the expectation of closing the transaction immediately, Cipla treated its bid for C-Scape as little more

than a placeholder while it continued to conduct due diligence on the product to determine if its interest in C-Scape was actually legitimate.

**F.      Achaogen Entered into the Cipla Sale Agreements**

45.      After nearly two weeks of negotiations, Achaogen entered into the following agreements with Cipla: (a) the Cipla Plazomicin Sale Agreement and (b) an asset purchase agreement dated June 20, 2019 for C-Scape for the amount of $1,200,000.00 (the "Cipla C-Scape Sale Agreement") (collectively, with the Cipla Plazomicin Sale Agreement, the "Cipla Sale Agreements").   A copy of the Cipla C-Scape Sale Agreement is attached hereto as **Exhibit G**.

46.      Neither of the Cipla Sale Agreements included any provisions or closing conditions that would have (i) allowed Cipla to terminate the agreements on the basis of the results of any additional due diligence inquiries or (ii) made the sale contingent on Cipla's obtaining BARDA funding.  Moreover, despite BARDA providing Achaogen with funding for the development of Plazomicin and C-Scape in the past, Cipla was fully cognizant that there was never a guarantee that Cipla would obtain BARDA funding generally or under Achaogen's existing BARDA contract specifically (which Cipla was unwilling to assume).

**G.      The Government's Objections to the Cipla Sales**

47.      The Court scheduled a sale hearing on June 24, 2019 to consider approval of the Cipla Sale Agreements.  Immediately prior to the sale hearing, the United States ("Government") raised entirely new issues related to national security.  To allow Achaogen sufficient time to address the informal comments from the United States, the sale hearing was adjourned. Nevertheless, Cipla informed Achaogen that it remained eager to consummate the Cipla Sale Agreements.

48.    Despite its concerns, the Government was sensitive to the need to expedite its review of Achaogen's transactions with Cipla given Achaogen's quickly diminishing liquidity. Because of Achaogen's cooperation with the Government and the government's willingness to conduct its review on an expedited basis, the Government's concerns with respect to Plazomicin were alleviated in nine days.

49.    By July 3, 201, Achaogen and the Government had resolved the Government's issues concerning national security and Achaogen immediately communicated this news to Cipla and Qilu, with the expectation of consummating the Cipla Sale Agreements upon the Court's entry of an order.  In order to move forward with the consummation of the Cipla Sale Agreements, the Government's only condition for approval was the inclusion of certain language in the sale order that preserved its rights under the Cipla Sale Agreements (given that BARDA funding was used to develop both Plazomicin and C-Scape).  Based on Cipla's assurances to Achaogen that it would close on the Cipla Sale Agreements regardless of the language to be included in the sale order, Achaogen allowed Cipla to participate in such discussions with the Government.

50.    On July 3, 2019, Achaogen sent Cipla a revised draft of the sale order that included the government's proposed language.

51.    On July 6, 2019, Cipla sent Achaogen a mark-up of the Government's language, which included changes to certain sections *previously* agreed upon by Cipla.  As explained by Cipla's counsel, one such change was intended to prevent Cipla from incurring any "potential liability for the clawback or recoupment of amounts" under Achaogen's contract with BARDA (which was not assumed by Cipla).

52.    Despite following up with Cipla numerous times, it took Cipla twelve days to reach agreeable language with the Government.  However, such agreement was accompanied by Cipla's

request to remove C-Scape as a purchased asset from the sale order for the time being despite Cipla's assurances that it would close on the Cipla Sale Agreements.  From that point on, Cipla began to waver on its commitment to close the C-Scape transaction.

### H.  Cipla Failed to Consummate the C-Scape Sale

53.     While sale order negotiations slowly progressed, the Government informed Cipla and Achaogen that it would not renew its BARDA contract with Achaogen for C-Scape, but rather, would require Cipla to apply for its own BARDA funding.

54.     Given Cipla's previous "clawback" concerns and disinterest in assuming the BARDA contract, Achaogen believed that Cipla would view the Government's decision positively since such concerns should have been alleviated and/or rendered moot.

55.     By July 2019, Achaogen started to receive mixed signals from Cipla regarding its willingness to close the C-Scape transaction.  On July 15, 2019, Nishant Saxena, Cipla's Global Chief Strategy Officer, told two separate Achaogen principals that "Looks like on C-Scape, the call with government did not go well.  Neither is the $6m committed that we were counting on, nor are they absolving Cipla of past liabilities clawback. Maybe just opt out of C-Scape?"  A text message exchange between Mr. Saxena and Blake Wise, the Debtor's Chief Executive Officer, is attached hereto as **Exhibit H**.  The following day, Mr Saxena stated that "I understand the barda contract expired in July (I didn't know).  The extension till September is on no costs modification basis (which means incremental $6+6m of funding in data room is not there anymore) … On C-Scape, we can talk … Worst case, if you want to go with backup that's fine too."  A text message exchange between Mr. Saxena and Nick Campbell, the Managing Partner for MERU, LLC, a professional employed by the Debtor, is attached hereto as **Exhibit I**.

56. Despite Mr. Saxena saying that Cipla was "unlikely" to go ahead with C-Scape (see text message exchange between Mr. Saxena and Mr. Campbell, attached hereto as **Exhibit J**), Nikhil Lalwani, Cipla's Chief Executive Officer for North America, repeatedly assured Achaogen that Cipla would consummate both Cipla Sale Agreements.

57. On or about July 24, 2019, and following the removal of C-Scape from the sale order, Cipla alerted Achaogen that it was not ready to proceed with its acquisition of C-Scape despite its commitment to do so as the Successful Bidder.

58. On information and belief, Cipla did not move forward with the C-Scape transaction because Cipla learned it would not receive BARDA funding for C-Scape. Thus, Cipla's interest in C-Scape was apparently subject to the Government's willingness to finance its development.

59. Nonetheless, such a decision should not and could not have served as a reason for Cipla to not fulfill its obligations as the Successful Bidder for C-Scape. Cipla was well aware that BARDA funding was not guaranteed and was not required as a closing condition under the Cipla C-Scape Agreement that it executed with Achaogen.

I. **The Court Approved the Cipla Plazomicin Sale Agreement**

60. Despite Achaogen's preference to close the Cipla Sale Agreements simultaneously, Cipla's apparent internal division concerning C-Scape forced Achaogen to proceed with the consummation of the Cipla Plazomicin Sale Agreement alone, as it was running out of liquidity and could no longer afford to operate the business as a going concern.

61. In trying to finalize a draft sale order (both before and after the Government's involvement), Achaogen had to work through numerous rounds of comments received from multiple parties in order to have a consensual sale hearing. Qilu, in particular, expressed concerns

that its rights to the China Assets should be governed by the Qilu License Agreement rather than any other documents which did not directly involve Qilu (i.e. the Cipla Plazomicin Sale Agreement and/or the Cipla Sale Order).

62.     Thus, to address Qilu's concerns, the parties (Cipla included) agreed to the following language in the sale order to preserve Qilu's rights: "Notwithstanding anything set forth in this Sale Order in connection with the China Assets, the rights of Qilu regarding the China Assets will be set forth in and governed by the Qilu License Agreement." Exhibit K, §12.

63.     Upon resolving Qilu's concerns, Achaogen, in an effort to at least get the Cipla Plazomicin Sale Agreement approved, removed C-Scape as a purchased asset in the proposed sale order at Cipla's request. Thereafter, Achaogen filed the order under certification of counsel on July 19, 2019, seeking approval of only the Cipla Plazomicin Sale Agreement.

64.     The Court approved the Cipla Plazomicin Sale Agreement on July 23, 2019 as memorialized in the *Order (I) Approving the Sale of Certain Assets of the Debtor to Cipla USA Inc. Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Cipla Sale Order") [D.I. 371]. A copy of the Cipla Sale Order is attached hereto as **Exhibit K**.

J.     **Qilu Walked Away from its Obligation to Purchase the China Assets**

65.     On July 22, 2019, nearly seven weeks after the June 3 Auction, Qilu's counsel informed Cassel, Achaogen's investment banker, that it may be in Achaogen's best interest to sell the China Assets to Cipla rather than continue to negotiate the Qilu License Agreement. Qilu's counsel cited the difficulties Cipla was creating in the negotiations over the Qilu License Agreement, its belief that Cipla had not been acting in good faith, and its incurred and anticipated

costs in connection with negotiations, as the primary factors for its desire to walk away from the transaction.

66.     On July 29, 2019, Qilu's counsel confirmed that "Qilu has determined to walk away from the transaction."[9]

K.     **Cipla Repudiates its Bid for the China Assets**

67.     After learning that Qilu was unlikely to follow through on its obligations as Successful Bidder for the China Assets, on July 25, 2019 Achaogen informed Cipla that it would have the opportunity to consummate the purchase of the China Assets, based on its designation as the Back-up Bidder at the June 3 Auction.  *See* **Exhibit L**.

68.     The Bidding Procedures and—more critically—the Cipla Sale Order unequivocally required Cipla, as Back-Up Bidder, to step into Qilu's shoes after Qilu elected not to follow through on its bid.  Cipla's obligation to close on the China Assets as the Back-up Bidder is set forth in the Bidding Procedures (which were approved in all material respects by the Bidding Procedures Order):

> If, after an order is entered by the Bankruptcy Court at the Sale Hearing approving the Successful Bid, the Successful Bidder shall fail to close the Sale because of a breach on the part of the Successful Bidder (after giving effect to any applicable cure periods or waivers), (i) the Back-up Bidder shall **automatically**, and without the need for any action by Achaogen or the Bankruptcy Court, **be deemed to be the Successful Bidder**, (ii) the Back-up Bid shall be deemed to be the Successful Bid, and (iii) **Achaogen and Back-up Bidder shall close the Sale within ten (10) Business Days following the date the Back-up Bidder becomes the Successful Bidder**, without the necessity of obtaining any further order of the Bankruptcy Court;

Exhibit A, §VII(M) (emphasis added).  Moreover, the Cipla Sale Order (the language of which was agreed to by Cipla) clearly stated that:

---

[9] In January of 2020, Achaogen reached a settlement with Qilu over Achaogen's claims related to Qilu's repudiation of its bid for the China Assets.  That settlement was approved by the Court on February 12, 2020 [D.I. 603].

> [Cipla] submitted the second highest or otherwise best bid at the [June 3] Auction for the outright purchase (not license) of the [China Assets] and was chosen by Achaogen as the Back-up Bidder for the purchase of the ownership interest in the [China Assets]. The purchase by [Cipla] of the Purchased Assets identified in the [Cipla Plazomicin Sale Agreement] is subject to (i) Qilu's rights (including ownership rights to the extent conveyed to Qilu under the Qilu License Agreement) with respect to the [China Assets] pursuant to the Qilu License Agreement, or (ii) subject to [Cipla's] right to deliver a Back-up Bid Termination Notice as described below, in the event Qilu fails to close on the Qilu License Agreement relating to the [China Assets], Achaogen's conveyance to Buyer as Back-up Bidder for the ownership rights of the [China Assets]....

Exhibit E, §12.

69. On July 30, 2019–just seven days after it agreed to an order further implementing its obligations as Backup Bidder for the China Assets, five days after receiving notice that Qilu was wavering on its obligations as Successful Bidder, and one day after Qilu confirmed its decision to back out—Cipla's counsel informed Achaogen that it "will not be proceeding to close on the [] China Assets." *See* **Exhibit M**. Cipla's counsel explained its reasoning as follows:

> Cipla believes that there were characterizations made to it by Achaogen representatives both before and during the course of the [June 3] Auction regarding the potential value of the [China Assets] which were incorrect. Cipla relied to its detriment on such characterizations in presenting its bids at the [June 3] Auction. Accordingly, Cipla formally withdraws the offer of $8.4 million to acquire the [China Assets] that it presented at the [June 3] Auction, and requests the immediate return of its Good Faith Deposit in the amount of $350,000.

*Id*.

70. Despite several requests by Achaogen to identify what incorrect "characterizations" were made at the June 3 Auction, Cipla refused to explain the basis for its allegation. The only ostensible reason for Cipla's repudiation came in the form of text messages between the principals for Achaogen and Cipla on July 31, 2019. Mr. Saxena, Cipla's Global Chief Strategy Officer, claimed that "we were led to believe that 'China outlicensing can easily fetch us $10m+' against which we naively put in 8.4m bid." *See* **Exhibit N**. Further, Mr. Saxena said "We are not against

China Assets but the price is crazy. By the way, China experience is identical to what we are seeing in Europe. 5-7m in multiple exchanges but the best offer till now is refundable 2m!" *See* **Exhibit O**.

71. In addition to Mr. Saxena's statements being wholly unsupported, the ██████ ████████████████ dated ████████████, signed by ████████ on behalf of ████ provides, in pertinent part, that ████████████████████████████████████



*See* **Exhibit P**.

72. On July 31, 2019, counsel for Cipla informed the Court that it would not be fulfilling its obligation to purchase the China Assets as the Back-up Bidder.

73. Cipla treated its contractual obligation to purchase the China Assets as though it were a mere option that would allow it to gauge the resale value of the asset before taking on the risk of owning it. Rather than honor its obligations under the Bidding Procedures Order and Cipla Sale Agreements, Cipla appears to have delayed negotiations with Qilu in order to give itself time to find a buyer willing to pay an amount above Cipla's bid. If successful, Cipla's delay tactics would likely have resulted in Qilu withdrawing its bid (which occurred), Cipla purchasing the China Assets as the Back-up Bidder, and Cipla having the opportunity to sell the asset to a third

party for a quick profit. In short, Cipla's bid was a play for time to scour the Chinese market's appetite for Plazomicin. However, Cipla's search did not yield the results it was seeking.

74. After unilaterally causing weeks of delay in negotiations and taking unreasonable positions against Qilu with regard to the Qilu License Agreement and the China Assets, on July 27, 2019 Cipla's counsel suddenly shifted its tone, stating that "we [Cipla] want to make sure that Qilu understands that Cipla is fully invested in working out an expeditious and mutually beneficial way to complete the transaction with Qilu." *See* **Exhibit Q**. The obvious, underlying reasons for Cipla completely changing its stance were (i) that it had by this point made the determination that the China Assets were not worth the amount of its irrevocable bid and (ii) its realization that Qilu was withdrawing its bid such that Cipla was now committed to purchase an asset that it no longer wanted.

75. On August 22, 2019, Achaogen wrote a letter to Cipla informing it of its material breaches of the Bidding Procedures Order, Cipla Sale Order and respective bids, as applicable.

## L. Achaogen Attempts to Mitigate its Damages

76. After learning of Cipla and Qilu's respective decisions to walk away from their various obligations under the Cipla Plazomicin Sale Agreement, the Bidding Procedures Order, Cipla C-Scape Sale Agreement and the Cipla Sale Order, as applicable, Achaogen devoted significant time and resources to finding alternative buyers for the China Assets and C-Scape.

77. After months of searching and communicating with interested parties, Achaogen identified XuanZhu (HK) Biopharmaceutical Limited ("XuanZhu") as a potential buyer for the China Assets.

78.     While attempting to mitigate the damages it suffered at the hands of Cipla, the consideration contemplated in the sale to XuanZhu was far less than the consideration offered by Cipla in its Back-up Bid.

79.     The Court ultimately approved the sale of the China Assets to XuanZhu for the amount of $4,500,000.00.

80.     Achaogen was unable to find any viable suitor for C-Scape prior to plan confirmation.  Thus far, Plaintiff has been unable to find a potential buyer despite receiving inquiries from several entities.

81.     On information and belief, the value of C-Scape has plummeted following the C-Scape Sale Order.

## <u>COUNT I</u>

### Breach of Contract
### (China Assets)

82.     Achaogen reincorporates paragraphs 1 - 81 as if fully restated herein.

83.     The June 3 Auction was conducted in accordance with and subject to the Bidding Procedures and Bidding Procedures Order.

84.     Cipla submitted an open and irrevocable bid for the Global Rights.

85.     At the June 3 Auction, given the varying types of bids for certain of Achaogen's assets (some of which overlapped), Cipla divided its bid into two parts: (i) a bid for the Global Rights (excluding the China Assets) and (ii) a bid for the China Assets.

86.     At the conclusion of the June 3 Auction, Cipla's bid of $8.4 million for the China Assets was designated as the Back-Up Bid to Qilu's winning bid for the China Assets.

87.     Cipla, as the Back-up Bidder, had an obligation to consummate the transaction for the China Assets if Qilu failed to close on the Qilu License Agreement.

88. Cipla's obligations as Back-up Bidder are memorialized in the Cipla Sale Order, the Bidding Procedures and the Bidding Procedures Order.

89. In July 2019, Qilu informed Achaogen that it would not be closing on the Qilu License Agreement. At that point, Cipla was deemed the Successful Bidder for the China Assets.

90. Subsequent to submitting its irrevocable bid for the China Assets, and after learning that Qilu would not close on the Qilu License Agreement, Cipla decided not to follow through on its irrevocable bid for the China Assets.

91. Cipla unequivocally stated that it "will not be proceeding to close on the China Assets." *See* Exhibit M.

92. Cipla failed to consummate its obligations as Back-Up Bidder for the China Assets.

93. Cipla failed to consummate its obligations upon its designation as the Successful Bidder for the China Assets.

94. Cipla did not have the right to revoke its Back-up Bid under the Bidding Procedures, the Bidding Procedures Order, the Cipla Plazomicin Sale Agreement or the Cipla Sale Order.

95. Cipla breached and failed to honor its obligations under the Bidding Procedures, the Bidding Procedures Order, the Cipla Plazomicin Sale Agreement and the Cipla Sale Order.

96. As a result of Cipla's breach and failure to honor its obligations, Achaogen incurred significant expense and lost proceeds, in an amount to be determined at trial.

## COUNT II

**Breach of Oral Contract**
**(China Assets)**

97. Achaogen reincorporates paragraphs 1 - 81 as if fully restated herein.

98. At the June 3 Auction, Cipla bid on the Global Rights.

99.     Given the varying types of bids for certain of Achaogen's assets (some of which overlapped), Cipla divided its bid for the Global Rights into two parts: (i) a bid for the Global Rights (excluding the China Assets) and (ii) a bid for the China Assets.

100.     At the conclusion of the June 3 Auction, Achaogen accepted (i) Cipla's bid for the Global Rights (excluding the China Assets) as the winning bid, and (ii) Cipla's bid of $8.4 million for the China Assets as the back-up bid in the event that Qilu's winning bid did not close.

101.     Cipla's offer to pay $8.4 million for the China Assets and act as back-up bidder pursuant to the terms of the Bidding Procedures and Bidding Procedures Order, and Achaogen's acceptance of that offer as a back-up, resulted in an oral contract (the "Oral Contract") under which Cipla was obligated to purchase the China Assets in the event that Qilu failed to close.

102.     As set forth in the Bidding Procedures and Bidding Procedures Order, the sale of the China Assets, whether to Qilu or Cipla, would occur less than one year from the date of the Oral Contract.

103.     After Qilu informed Achaogen that it would not close on the Qilu License Agreement, and in accordance with the Bidding Procedures, Cipla was designated as the Successful Bidder for the China Assets.

104.     Subsequent to submitting its irrevocable bid for the China Assets, and after learning that Qilu would not close on the Qilu License Agreement, Cipla chose not honor its irrevocable bid and obligation to purchase the China Assets.

105.     Cipla failed to consummate its obligations as Successful Bidder for the China Assets.

106.     Cipla did not have the right to revoke its Back-up Bid under the Oral Contract or the Bidding Procedures Order.

107. As a result of Cipla's breach and failure to honor its obligations, Achaogen was forced to conduct a new round of marketing and locate a new purchaser for the China Assets.

108. Although Achaogen ultimately found a willing buyer and sold the China Assets, it did so at a sale price significant lower than the amount of Cipla's irrevocable bid.

109. As a result of Cipla's breach of its obligations under the Oral Contract regarding the China Assets, Achaogen incurred significant expense and lost proceeds, in an amount to be determined at trial.

## COUNT III

### Breach of Contract – Bad Faith
### (China Assets)

110. Achaogen reincorporates paragraphs 1 – 96 as if fully restated herein.

111. At the June 3 Auction, Cipla submitted an open and irrevocable bid for the Global Rights (subject to the Debtor's rights to license the China Assets).

112. At the conclusion of the June 3 Auction, Cipla was designated as the Successful Bidder for the Global Rights (subject to the Debtor's rights to license the China Assets). Qilu was designated as the Successful Bidder of the China Assets, while Cipla was designated as the Back-Up Bidder for the China Assets.

113. Achaogen and Cipla entered into the Cipla Plazomicin Sale Agreement on June 20, 2019. The Cipla Sale Order was approved by this Court on July 23, 2019.

114. In accordance with their terms, Cipla was obligated under the Cipla Plazomicin Sale Agreement and Cipla Sale Order to negotiate with Qilu and Achaogen in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement.

115. Cipla breached its obligation to negotiate in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement.

116.    Among other things, Cipla (i) intentionally delayed its responses and proposed revisions to the Qilu License Agreement; (ii) insisted on egregious changes to the form license agreement that would have greatly reduced the value of the China Assets; (iii) attempted to run out the clock on Achaogen's limited liquidity; and (iv) conducted market due diligence on the resale value of the China Assets as a potential buyer after agreeing to negotiate the Qilu License Agreement in good faith.

117.    Cipla intentionally disregarded its duties and demonstrated a deliberate indifference as to its responsibilities as the Back-Up Bidder and eventual Successful Bidder for the China Assets.

118.    Cipla's actions and inactions were a factor in Qilu deciding to withdraw its bid for the China Assets, a bid which would have garnered $8.5M for the estate.

119.    Achaogen suffered damages as a result of Cipla's lack of good faith in negotiating the Qilu License Agreement in an amount to be determined at trial.

## COUNT IV

### Tortious Interference with Contract
### (China Assets)

120.    Achaogen reincorporates paragraphs 1 - 81 as if fully restated herein.

121.    Cipla and Qilu submitted open and irrevocable bids for the Global Rights (subject to the Debtor's rights to license the China Assets) and China Assets, respectively.

122.    At the June 3 Auction, Cipla was designated as the Successful Bidder for the Global Rights excluding the China Assets and Qilu was designated as the Successful Bidder for the China Assets.  Cipla was also designated as the Back-up Bidder for the China Assets.

123.     As the Successful Bidder for the China Assets, Qilu had an agreement with Achaogen and was obligated to purchase the China Assets from Achaogen (the "<u>Qilu Agreement</u>"), which rights were to be conveyed by way of the Qilu License Agreement.

124.     Having participated in the June 3 Auction and being designated as Back-Up Bidder for the China Assets, Cipla was aware of Qilu's agreement with Achaogen to purchase the China Assets in the form of a license.

125.     As the Successful Bidder for the Global Rights excluding the China Assets, Cipla was obligated to negotiate the Qilu License Agreement in good faith and using commercially reasonable efforts, pursuant to the terms of the Cipla Plazomicin Sale Agreement and Cipla Sale Order.

126.     Cipla interfered with the Qilu Agreement by delaying and acting unreasonably in negotiations concerning the Qilu License Agreement.

127.     Cipla intentionally delayed and made unreasonable demands in negotiations concerning the Qilu License Agreement in order to give Cipla time to scour the Chinese market to determine the resale value of the China Assets.

128.     Cipla's conduct during negotiations concerning the Qilu License Agreement was a significant factor contributing to Qilu's ultimate refusal to consummate the Qilu License Agreement and repudiation of its bid for the China Assets.

129.     Cipla had no justification for disrupting negotiations over the Qilu License Agreement.  For example, the Global Rights for which Cipla was the Successful Bidder expressly excluded the China Assets, such that Cipla's unwillingness to convey to Qilu a perpetual license or rights to sublicense in China were unreasonable and contrary to Qilu's agreement with Achaogen to purchase the China Assets.

130.    Cipla's failure to negotiate in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement was in violation of its obligations under the Cipla Plazomicin Sale Agreement and Cipla Sale Order.

131.    As a result of Cipla's tortious interference, Achaogen was unable to reach agreement with Qilu on the Qilu License Agreement and Qilu walked away from its bid for the China Assets.

132.    As a result of Cipla's tortious interference, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

## COUNT V

### Tortious Interference with Business Relations

133.    Achaogen reincorporates paragraphs 1 – 81, 120 - 132 as if fully restated herein.

134.    The anticipated sale of the China Assets to Qilu by way of the Qilu License Agreement was a business opportunity for which Achaogen stood to gain financially.

135.    It was highly likely that Qilu would have consummated the purchase of the China Assets because of the obligations to close imposed on Qilu by operation of the Bidding Procedures Order and Qilu's participation in the June 3 Auction, including its agreement to become the Successful Bidder.

136.    Cipla was aware of the Qilu Agreement for the purchase of the China Assets by way of the Qilu License Agreement.

137.    Cipla was obligated under the Cipla Plazomicin Sale Agreement and Cipla Sale Order to participate in negotiations with Achaogen and Qilu regarding the Qilu License Agreement in good faith and using commercially reasonable efforts.

138.     Cipla tortiously interfered with Achaogen's business relations with Qilu by negotiating the Qilu License Agreement in bad faith, and surreptitiously seeking marketing and sale opportunities for the China Assets.

139.     Cipla intentionally interfered with the sale of the China Assets to Qilu with the hope of buying the China Assets directly from Achaogen and then reselling the China Assets for a profit.

140.     Cipla's tortious interference disrupted negotiations with Qilu over the Qilu License Agreement, and Achaogen was ultimately unable to reach agreement with Qilu on the Qilu License Agreement resulting in Qilu walking away from its bid.

141.     Cipla's conduct in negotiations over the Qilu License Agreement was a significant factor in Qilu's decision to walk away from its obligation to purchase the China Assets.

142.     If Cipla had negotiated the Qilu License Agreement in good faith and using commercially reasonable efforts, it is likely that Achaogen would have consummated the sale of the China Assets to Qilu, in which case Achaogen would have realized $8.5 million in sale proceeds from Qilu.

143.     As a result of Cipla's tortious interference, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

## COUNT VI

### Tortious Interference with Prospective Economic Advantage

144.     Achaogen reincorporates paragraphs 1 – 81, 120 – 143 as if fully restated herein.

145.     At the June 3 Auction, Cipla and Qilu submitted open and irrevocable bids for the Global Rights (subject to the Debtor's rights to license the China Assets) and China Assets, respectively.

146. At the conclusion of the June 3 Auction, Cipla was designated as the Successful Bidder for the Global Rights excluding the China Assets and Qilu was designated as the Successful Bidder for the China Assets. Cipla was also designated as the Back-up Bidder for the China Assets.

147. Cipla was obligated to negotiate the Qilu License Agreement in good faith and using commercially reasonable efforts pursuant to the terms of the Cipla Plazomicin Sale Agreement and Cipla Sale Order.

148. The consummation of the Qilu License Agreement would have resulted in closing the sale of the China Assets to Qilu, which would have resulted in Achaogen receiving $8.5M in sale proceeds.

149. Cipla instead interfered with Achaogen's ability to convey the China Assets to Qilu under the Qilu License Agreement by delaying negotiations while it scoured the Chinese market to determine the resale value of the China Assets.

150. Cipla's actions impeded negotiations with Qilu and Qilu ultimately refused to consummate the Qilu License Agreement, repudiating its bid for the China Assets.

151. Cipla tortiously interfered with Achaogen's business relations with Qilu by negotiating the Qilu License Agreement in bad faith, and surreptitiously attempting to sell the China Assets to a third party who may have been willing to pay more.

152. Cipla's conduct was wrongful in that it improperly took advantage of its position as a participant in negotiations regarding the Qilu License Agreement to buy time to explore the value of the China Assets in the Chinese market.

153. Cipla would not have been interested in the value of the China Assets in the Chinese market unless Cipla intended to take steps to assure Qilu would withdraw its bid, in which case Cipla would become the Sucessful Bidder (which is what happened).

154.    As a result of Cipla's tortious interference, Achaogen was unable to reach agreement with Qilu on the Qilu License Agreement and Qilu ultimately walked away from its bid for the China Assets.

155.    As a result of Cipla's tortious interference, Cipla ultimately backed out of its bid.

156.    On information and belief, a primary force behind Cipla's decision to repudiate its bid was its unhappiness with the results of its investigation into the Chinese marketplace, although Cipla did not undergo these investigative efforts until after it submitted its irrevocable bid and its irrevocable bid was not contingent on conducting due diligence.

157.    As a result of Cipla's tortious interference, Achaogen was forced to re-market and sell the China Assets, ultimately for a price well below the amount of the Qilu and Cipla irrevocable bids.

158.    As a result of Cipla's conduct, Achaogen lost out on the prospective economic advantage that would have resulted from a sale of the China Assets to Qilu.

159.    As a result of Cipla's tortious interference, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

## COUNT VII

### Breach of Contract
### (C-Scape)

160.    Achaogen reincorporates paragraphs 1 - 81 as if fully restated herein.

161.    Cipla was designated as the Successful Bidder for C-Scape at the June 12 Auction.

162.    Achaogen and Cipla entered into the Cipla C-Scape Sale Agreement on June 20, 2019.

163.    The Cipla C-Scape Sale Agreement is a valid and binding contract for Achaogen to sell C-Scape to Cipla.

164.    The sale of C-Scape to Cipla was scheduled to close on or prior to June 28, 2019 (the "C-Scape Outside Date").  *See* Exhibit G §2.4.

165.    Although the C-Scape Outside Date had passed, Cipla unequivocally told Achaogen that it would proceed with closing the Cipla C-Scape Sale Agreement.

166.    On or about July 20, 2019, Cipla informed Achaogen that it would not close on the C-Scape Sale Agreement.

167.    Cipla did not have the right to terminate the Cipla C-Scape Sale Agreement, and thus, breached the terms of the contract.

168.    Achaogen was unable to properly liquidate C-Scape through the bankruptcy process prior to appointment of the Plan Trustee.   The Plan Trustee has been unable to properly liquidate C-Scape.

169.    On information and belief, the value of the C-Scape asset has deteriorated significantly since Cipla's agreement to purchase C-Scape.

170.    Achaogen suffered damages as a result of Cipla's breach of the Cipla C-Scape Sale Agreement, including but not limited to expense and lost proceeds, in an amount to be determined at trial.

## COUNT VIII

**Promissory Estoppel**
**(C-Scape)**

171.    Achaogen reincorporates paragraphs 1 – 81, 160 – 170 as if fully restated herein.

172.    Cipla was designated as the Successful Bidder for C-Scape at the June 12 Auction.

173.    Achaogen and Cipla entered into the Cipla C-Scape Sale Agreement on June 20, 2019.

174. The Cipla C-Scape Sale Agreement is a valid and binding contract for Achaogen to sell C-Scape to Cipla, with such sale previously scheduled to close on or prior to the C-Scape Outside Date.

175. Although the C-Scape Outside Date of the Cipla C-Scape Sale Agreement had passed, Cipla unequivocally stated to Achaogen that it would proceed with closing the Cipla C-Scape Sale Agreement.

176. On information and belief, and without informing Achaogen, Cipla's representations and conduct related to the C-Scape Sale Agreement were contingent upon Cipla receiving BARDA funding.

177. Cipla knew or should have known that its statements that it intended to follow through on its agreement to purchase C-Scape would cause Achaogen not to take steps to find another purchaser for C-Scape.

178. Achaogen detrimentally relied on Cipla's statement that it would close the Cipla C-Scape Sale Agreement. As a result of Cipla's statement that it intended to close the C-Scape transaction, Achaogen declined other opportunities to sell or market C-Scape to other interested bidders, including, for a time, the Back-up Bidder.

179. The Government withdrew BARDA funding before Achaogen could locate a replacement buyer, which resulted in a loss in C-Scape's value.

180. C-Scape's value has deteriorated further as a result of the passage of time.

181. Achaogen was unable to properly liquidate C-Scape through the bankruptcy process and suffered damages as a result of its reliance on Cipla's statement that it would consummate the Cipla C-Scape Sale Agreement, in an amount to be determined at trial.

## COUNT IX

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (China Assets and C-Scape)

182.    Achaogen reincorporates paragraphs 1 – 81 as if fully restated herein.

183.    Cipla was designated as the Successful Bidder for the Global Rights excluding the China Assets and Qilu was designated as the Successful Bidder for the China Assets. Cipla was also designated as the Back-up Bidder for the China Assets.

184.    Cipla acted unreasonably and in bad faith by repudiating its irrevocable bid.

185.    Cipla treated its obligation to purchase the China Assets as a mere option that would allow it to gauge the resale value of the asset before taking on the risk of owning it.

186.    On information and belief, Cipla intentionally delayed and acted unreasonably in negotiations in order to give it time to scour the Chinese market to determine the resale value of the China Assets. If successful, Cipla's delay tactics would likely have resulted in Qilu withdrawing its bid (which occurred), Cipla purchasing the China Assets as the Back-up Bidder, and Cipla having the opportunity to sell the asset to a third party for a quick profit. However, Cipla's search did not yield the results it was seeking.

187.    After performing additional due diligence, which it performed only after submitting its irrevocable bid and agreeing to purchase the China Assets without any due diligence conditions, Cipla determined that it would not benefit from following through on its obligations and instead backed out of the purchase.

188.    In addition, Cipla's conduct in negotiations concerning the Qilu License Agreement were a significant factor contributing to Qilu's ultimate refusal to consummate the Qilu License Agreement and repudiation of its bid for the China Assets.

189. Cipla acted unreasonably and in bad faith in connection with its agreement to purchase the China Assets.

190. Cipla had no justification for backing out of and failing to perform its obligations regarding the China Assets. Cipla's conduct in negotiations concerning the Qilu License Agreement was unreasonable and not in good faith. After Qilu backed out, Cipla was obligated under the Bidding Procedures and the Cipla Sale Order to purchase the China Assets but failed to do so. Any due diligence concerning its perceived value of the China Assets should have been performed prior to submitting an irrevocable bid at a competitive auction for $8.4 million.

191. As a result of Cipla's failure to comply with the implied covenant of good faith and fair dealing, both Qilu and Cipla failed to consummate their bids to purchase the China Assets.

192. Achaogen expended significant costs in connection with the June 3 Auction and subsequent legal costs, which costs were rendered a waste after both successful bidders backed out.

193. As a result of Cipla's conduct, Achaogen was forced to recommence the marketing and sale process for the China Assets, at significant cost to Achaogen.

194. Although Achaogen was ultimately able to sell the China Assets to a third-party buyer, the sale price was significantly lower than the Qilu and Cipla bids.

195. Cipla further breached its covenant of good faith and fair dealing by backing out of its obligation to purchase C-Scape.

196. Cipla agreed to purchase C-Scape with or without BARDA funding, only to back out of its obligation after learning that the Government would not renew BARDA funding for C-Scape.

197.     Cipla stated to Achaogen that it would follow through on its obligation to purchase C-Scape, when those statements were not true.

198.     Achaogen relied on Cipla's statements in forbearing from locating another purchaser at a time when C-Scape was at its most marketable.

199.     The bankruptcy estate is not likely to realize sale proceeds from C-Scape anywhere close to the $1,200,000.00 purchase price agreed to by Cipla in the Cipla C-Scape Sale Agreement, if it can be sold at all.

200.     As a result of Cipla's conduct, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

## COUNT X

### Contempt for Willful Violation of Court Orders
### (China Assets)

201.     Achaogen reincorporates paragraphs 1 - 200 as if fully restated herein.

202.     The June 3 Auction was conducted in accordance with and subject to the Bidding Procedures and Bidding Procedures Order.

203.     Cipla was aware that the Bidding Procedures Order was in effect when it participated at the June 3 Auction.

204.     At the conclusion of the June 3 Auction, Cipla's bid of $8.4 million for the China Assets was designated as the Back-Up Bid to Qilu's winning bid for the China Assets.

205.     Cipla, as the Back-up Bidder, had an obligation to consummate the transaction for the China Assets if Qilu failed to close on the Qilu License Agreement.

206.     On July 23, 2019, the Court entered the Cipla Sale Order.

207.     Cipla's obligations as Back-up Bidder are memorialized in the Cipla Sale Order and the Bidding Procedures Order.

208. After Qilu informed Achaogen that it would not proceed to closing on the China Assets, Cipla was deemed the Successful Bidder for the China Assets.

209. Subsequent to submitting its irrevocable bid for the China Assets, and after learning that Qilu would not close on the Qilu License Agreement, Cipla decided not to follow through on its irrevocable bid for the China Assets.

210. Cipla failed to consummate its obligations as Back-Up Bidder.

211. Cipla did not have the right to revoke its Back-up Bid under the Bidding Procedures Order or the Cipla Sale Order.

212. Cipla breached and failed to honor its obligations as Back-Up Bidder under the Bidding Procedures Order and the Cipla Sale Order.

213. Cipla knowingly and willfully violated its obligations as Back-Up Bidder under the Bidding Procedures Order and the Cipla Sale Order.

214. As set forth in paragraph 12 of the Cipla Sale Order, Cipla was obligated to negotiate with Qilu and Achaogen in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement.

215. Cipla breached its obligation to negotiate in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement, in violation of its obligations under the Cipla Sale Order.

216. Among other things, Cipla (i) intentionally delayed its responses and proposed revisions to the Qilu License Agreement; (ii) insisted on egregious changes to the form license agreement that would have greatly reduced the value of the China Assets, which changes were far beyond the Debtor's form agreement in contravention of paragraph 12 of the Cipla Sale Order; (iii) attempted to run out the clock on Achaogen's limited liquidity; and (iv) conducted market due

diligence on the resale value of the China Assets as a potential buyer after agreeing to negotiate the Qilu License Agreement in good faith.

217.     Cipla was aware of the Bidding Procedures Order and the Cipla Sale Order at the time of their entry, as was Cipla's counsel.  In fact, Cipla negotiated with Achaogen over the language in the Cipla Sale Order and thus was very familiar with its terms even before its entry.

218.     As a result of Cipla's breach and willful failure to honor its obligations under the Bidding Procedures Order and Cipla Sale Order, Achaogen incurred significant expense and lost proceeds, in an amount to be determined at trial.

219.     Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish Cipla for willfully violating court orders, in an amount to be determined by the Court.

220.     Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Automatic Stay and issue appropriate sanctions as a result of their contempt pursuant to Section 105 of the Bankruptcy Code.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust, respectfully requests that this Court enter an order:

(a) Requiring Cipla to compensate the Achaogen Plan Trust for the costs and damages incurred by the bankruptcy estate in connection with Cipla's breach of its contractual obligations as Back-Up Bidder, and eventually Successful Bidder, for the China Assets;

(b) Requiring Cipla to compensate the Achaogen Plan Trust for the costs and damages incurred by the bankruptcy estate in connection with Cipla's tortious interference with Achaogen's

efforts to sell the China Assets to Qilu, including its failed negotiations concerning the Qilu License Agreement;

(c) Requiring Cipla to compensate the Achaogen Plan Trust for the costs and damages incurred by the bankruptcy estate in connection with Cipla's breach of its obligation to purchase C-Scape;

(d) Requiring Cipla to compensate the Achaogen Plan Trust for the costs and damages incurred by the bankruptcy estate in connection with Cipla's breach of the implied covenant of good faith and fair dealing in failing to consummate purchases for the China Assets and C-Scape and failing to negotiate the Qilu License Agreement in good faith;

(e) Imposing civil sanctions against Cipla for its willful violation of Court orders;

(f) Awarding Plaintiff its costs and attorneys' fees in drafting and prosecuting this Complaint; and

(g) Granting other just and equitable relief that this Court deems proper.

May 27, 2021
Wilmington, Delaware

**COLE SCHOTZ P.C.**

By: */s/ Andrew J. Roth-Moore*
Justin R. Alberto, Esq. (No. 5126)
Andrew J. Roth-Moore, Esq. (No. 5988)
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Email: jalberto@coleschotz.com
        aroth-moore@coleschotz.com

*-and-*

Joseph L. Steinfeld, Jr., Esq., MN SBN 0266292
Nicholas C. Brown, Esq., NC SBN 38054
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (877) 746-4275
Fax: (651) 406-9676
Email: nbrown@askllp.com

*-and-*

Marianna Udem, Esq.
ASK LLP
60 East 42nd Street, 46th Fl.
New York, New York  10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

*Counsel for Edward E. Neiger, in his Capacity as Plan Trustee of the Achaogen Plan Trust*