# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Achaogen, Inc., | Case No. 19-10844 (BLS) |
| Debtor.[1] | |
| Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust, | Adv. Pro. No. 21-50479 (BLS) |
| Plaintiff | |
| v. | |
| Cipla USA Inc., | |
| Defendant. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## PARTIAL MOTION TO DISMISS COMPLAINT FILED BY CIPLA USA INC.

Justin R. Alberto (No. 5126)
Andrew Roth-Moore (No. 5988)
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Email: jalberto@coleschotz.com
        aroth-moore@coleschotz.com

Nicholas C. Brown, Esq. (admitted *pro hac vice*)
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (651) 289-3846
Fax: (651) 406-9676
Email: nbrown@askllp.com

*Counsel for Edward E. Neiger, in his capacity as
Plan Trustee of the Achaogen Plan Trust*

Dated: September 10, 2021
Wilmington, Delaware

---

[1]     The last four digits of Achaogen's federal tax identification number are 3693.  The last four digits of the Achaogen Plan Trust's tax identification number are 4172.

# TABLE OF CONTENTS

I.     TABLE OF AUTHORITIES …………………….………………………………...ii

II.    STATEMENT OF FACTS……………………………………………………………1

III.   SUMMARY OF ARGUMENT…………………………………………………….....3

IV.   ARGUMENT……………………………………………………………………….....4

     A.  Standard of Review………………………………….……………………………....4

     B.  Counts IV, V and VI Plausibly Demonstrate that Cipla Tortiously Interfered with the Transactions between Achaogen and Qilu………………………………………5

         i.   Tortious Interference with Contract…………………………………………6

        ii.  Tortious Interference with Business Relations and Prospective Economic Advantage………………………………………………………………10

             <u>1.</u>  Cipla is Liable for Tortious Interference Regardless of its Relationship to Achaogen and Qilu………………………………………………14

             <u>2.</u>  *Tenneco* is Not Applicable to Claims for Tortious Interference with Business Relations and Prospective Economic Advantage……..……...16

             <u>3.</u>  Cipla was Not a Party to the Qilu Agreement……………………17

     C.  The Claim for Promissory Estoppel (C-Scape) is Properly and Sufficiently Pled as an Alternative Theory for Relief……………………………………………………..18

     D.  The Well-Pleaded Allegations in the Complaint Support Relief for Breach of Implied Covenant of Good Faith and Fair Dealing…………………………………………..21

     E.  Plaintiff's Claim for Civil Contempt is Proper………………………………………24

   V.  CONCLUSION …………………………………………………………………………25

61299/0003-41547250v1

**Cases**

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,*
    910 A.2d 1020 (Del. Ch. 2006)……………………………………………………21, 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................4-5, 25

*Bandera Master Fund LP v. Boardwalk Pipeline Partners LP,*
    2019 WL 4927053 (Del. Ch. Oct. 7, 2019)……………………………..………14, 15

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................4-5, 25

*Burtch v. Milberg Factors, Inc.,*
    662 F.3d 212, 221 (3d Cir. 2011)………………………………………………5

*Camden v. Mayhew,*
    129 U.S. 73, 83, 9 S.Ct. 246, 248, 32 L. Ed. 608 (1889)……….……………………7

*Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.,*
    822 A.2d 1024 (Del. 2003)……………………………………….……………..18

*Dieckman v. Regency GP LP,*
    155 A.3d 358 (Del. 2017)………………………………………………22, 23

*Dunlap v. State Farm Fire and Cas. Co.,*
    878 A.2d 434 (Del. 2005)……………………………………….……………..22

*Freehill v. Greenfeld,*
    204 F.2d 907 (2d Cir. 1953)………………………………………….…………7

*In re Amp'd Mobile, Inc.,*
    404 B.R. 118, 122 (Bankr. D. Del. 2009)…………………………………….……5

*In re CVR Refining, LP Unitholder Litigation,*
    2020 WL 506680 (Del. Ch. Jan. 31, 2020)………………………………………6, 14-15

*In re FAH Liquidation Corp.,*
    581 B.R. 98 (Bankr. D. Del. 2017)……………………………………....…18-19, 22

*Hechinger Investment Co. of Delaware, Inc.,*
    282 B.R. 149 (Bankr. D. Del. 2002)……………………………………………..24

*In re Managed Storage International, Inc.,*
    601 B.R. 261 (Bankr. D. Del. 2019)……………………………………………..25

*In re Safety-Kleen,*

ii

331 B.R. 605 (Bankr. D. Del. 2005)……………………………….………………………24

*In re Susquehanna Chemical Corp.*,
    92 F. Supp. 917, 920 (W.D. Pa. 1950)………………………….………………………7

*In re WCI Communities, Inc.*,
    2012 WL 1981713 (Bankr. D. Del. Jun. 1, 2012)…………………………….…………25

*KT4 Partners LLC, et al. v. Palantir Technologies, Inc., et al.*,
    2018 WL 4033767 (Del. Super. Aug. 22, 2018)……………………………………….10

*Matter of Fairfield General Corp.*,
    75 N.J. 398, 383 A.2d 98 (Sup. Ct. N.J. 1978)………………………………………….7

*Nama Holdings, LLC v. Related WMC LLC*,
    2014 WL 653667 (Del. Ch. Nov. 17, 2014)……………………………………………6

*Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*,
    496 F. Supp. 2d 404 (D. Del. 2007)……………………………………………………4

*Preston Hollow Capital LLC v. Nuveen LLC*,
    2020 WL 1814756 (De. Ch. Apr. 9, 2020)……………………………………………10

*Tenneco Automotive, Inc. v. El Paso Corp.*,
    2007 WL 92621 (Del. Ch. Jan. 8, 2007) …………………………………………14, 16-17

*Trueblue, Inc. et al. v. Leeds Equity Partners IV, LP*,
    2015 WL 5968726 (Del. Super. Sept. 25, 2015) ……………………………………18

*Velocitel, Inc. v. Charles M. Forman (In re Open Range Communications, Inc.)*,
    2013 WL 542471 (Bankr. D. Del. Feb. 12, 2013)…………………………….…………5

*WaveDivision Holdings, LLC v. Highland Capital Management, L.P.*,
    49 A.3d 1168, 1174 (Del. 2012)……………………………………………………6


**Rules**
Federal Rule of Bankruptcy Procedure 7012 .................................................................4
Federal Rule of Civil Procedure 12(b)(6) ....................................................................4


**Secondary Sources**
R. Lord, *Williston on Contracts* (4th ed.)………………………………………….……..6-7

61299/0003-41547250v1

Edward E. Neiger, in his capacity as Plan Trustee of the Achaogen Plan Trust ("Trustee" or "Plaintiff") hereby files this Memorandum of Law in support of his objection (the "Objection") to the *Partial Motion to Dismiss Complaint* (the "Motion to Dismiss")[2] filed by Cipla USA Inc. ("Defendant" or "Cipla"). In support of his Objection, the Trustee hereby respectfully shows as follows:

## STATEMENT OF FACTS

The facts giving rise to Plaintiff's claims are alleged in detailed fashion in the Complaint, which factual allegations are incorporated by reference herein. In summary, shortly after filing bankruptcy Achaogen pursued the sale of substantially all of assets, which assets included antibiotic drugs Plazomicin and C-Scape.[3] The Court entered a Bidding Procedures Order establishing an auction process for the purchase of both assets.[4]

On June 3, 2019, Achaogen auctioned the Plazomicin asset. The Plazomicin asset was split into two separate components for bidding purposes: the rights to Plazomicin in the greater China region (the "China Assets") and the global rights except for the China Assets (the "Global Rights").[5] At the conclusion of the June 3 auction, Achaogen designated Cipla the successful bidder for the Global Rights, and Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") the successful bidder for the China Assets. Cipla had submitted competing bids for the China Assets

---

[2] Adv. Pro. D.I. No. 9.

[3] Complaint ¶ 12-13.

[4] Complaint ¶ 18-21.

[5] Complaint ¶ 24-28.

1

and was designated the back-up bidder.[6]  The China Assets were to be conveyed in the form of a perpetual, irrevocable, exclusive and royalty-free license, with the right to grant sub-licenses.[7]

Following the June 3 auction, Achaogen, Cipla and Qilu attempted to negotiate the terms of the license for the China Assets (the "Qilu License Agreement").  However, and as discussed in more detail, *infra*, Cipla's conduct surrounding these negotiations was egregious to the point that Qilu decided to walk away from its agreement to purchase the China Assets.[8]  Upon learning that Qilu was repudiating its bid, and in accordance with the Bidding Procedures Order, Achaogen designated Cipla, as back-up bidder at auction, the successful bidder for the China Assets.[9]  In response, Cipla informed Achaogen that it too was backing out of its obligation to purchase the China Assets.[10]

On June 12, 2019, Achaogen conducted a separate auction for the C-Scape asset at which Cipla was the successful bidder.  Achaogen and Cipla entered into an asset purchase agreement for C-Scape, however, Cipla delayed negotiations over the language in a proposed sale order before ultimately determining that it would not follow through with its purchase of C-Scape.[11]

After Cipla refused to honor its obligations to purchase both the China Assets and C-Scape, Achaogen was forced to locate additional buyers for these assets.  Ultimately, Achaogen

---

[6] Complaint ¶ 30.

[7] Complaint ¶ 31.

[8] Complaint ¶¶ 34-40, 65-66

[9] Complaint ¶¶ 67-68.

[10] Complaint ¶ 69.

[11] Complaint ¶¶ 45-46, 50-59.

61299/0003-41547250v1

sold the China Assets to a third party for far less than Cipla's agreed sale price, but was unable to monetize C-Scape.[12]

In May of 2020 the Achaogen Plan Trust was established and Plaintiff was appointed as Plan Trustee. The Trustee timely filed the Complaint against Cipla to recover damages suffered by the estate as a result of Cipla's conduct.

## SUMMARY OF ARGUMENT

The Complaint seeks to hold Cipla accountable for its conduct throughout the bankruptcy sale process, which conduct caused the bankruptcy estate to suffer nearly $10 million in lost sale proceeds in addition to significant expense. The significance of Cipla's conduct was threefold: Cipla (i) took out the winning bidder for the China Assets, (ii) backed away from its obligations as back-up bidder for the same assets, and (iii) terminated its agreement to purchase the C-Scape assets.

It is not an exaggeration to equate Cipla's conduct throughout the bankruptcy sale process to that of a bull in a china shop. After failing to submit the highest bid for the China Assets, Cipla bullied the winning bidder until it backed away from the deal. After replacing the top bidder for the China Assets and agreeing to purchase C-Scape, Cipla suddenly experienced buyer's remorse and simply walked away from its obligations. In doing so, Cipla treated the June 3 and June 12 auctions, and the related court orders and purchase agreements, as though they had no enforceable effect.

As borne out in the Complaint, there can be no doubt that Cipla wrongfully interfered with Achaogen's efforts to sell the China Assets to Qilu. To find otherwise would upset the sanctity of the court's bidding procedures and auction process by inviting back-up bidders to take

---

[12] Complaint ¶¶ 79-80.

whatever actions necessary to undermine the winning bidder under the guise of fair competitive spirit. Any competition between Cipla and Qilu was resolved upon the falling of the hammer at the June 3 auction. Rather than accept defeat, Cipla continued to run amok, including surveying the market in China for potential profits and undermining negotiations for Qilu's license of the China Assets. The value of Achaogen's failed deal with Qilu was $8.5 million.

Similarly, and as discussed, *infra*, Cipla's wrongful conduct gives rise to claims for relief for promissory estoppel, breach of implied covenant of good faith and fair dealing, and civil contempt. Plaintiff therefore requests that the Motion to Dismiss be denied in its entirety.

## ARGUMENT

A. <u>Standard of Review</u>

The purpose of a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure, "is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (internal citations omitted). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege sufficient facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The plausibility standard does not require that a complaint include detailed factual allegations; rather, a claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In applying the *Twombly/Iqbal* plausibility standard, a court must accept all well-pled factual

4

allegations as true and draw all reasonable inferences in favor of the plaintiff. *In re Amp'd Mobile, Inc.*, 404 B.R. 118, 122 (Bankr. D. Del. 2009).

This Court follows a three-step process outlined by the Third Circuit Court of Appeals for determining the sufficiency of a complaint under the *Twombly/Iqbal* standard:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Velocitel, Inc. v. Charles M. Forman (In re Open Range Communications, Inc.)*, 2013 WL 542471, at *3 (Bankr. D. Del. Feb. 12, 2013) (KJC) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)) (internal citations and quotations omitted). Application of this process demonstrates that the Complaint sufficiently states claims for relief against Defendant.

B.    Counts IV, V and VI Plausibly Demonstrate that Cipla Tortiously Interfered with the Transactions between Achaogen and Qilu

The Complaint contains three related claims for tortious interference by Cipla: Count IV, tortious interference with contract, Count V, tortious interference with business relations, and Count VI, tortious interference with prospective economic advantage (hereafter, the "Tortious Interference Claims"). The essence of the Tortious Interference Claims is straightforward: Cipla intentionally disrupted efforts by Achaogen and Qilu to complete a sale of the China Assets, so that Cipla could profit from the China Assets itself. The factual allegations underlying this premise demonstrate with plausibility that each element of the Tortious Interference Claims is met and that Cipla will be found liable.

Rather than directly confront Plaintiff's theory of liability, the Motion to Dismiss confuses the issue by asserting that (i) Cipla itself was a party to Qilu's agreement to purchase

5

the China Assets from Achaogen, and (ii) Cipla's role gave it freedom to interfere with Qilu's efforts to acquire the China Assets without risk of retribution. Cipla's position does not hold water, however, because it fails to recognize Qilu's agreement to purchase the China Assets and misstates the law regarding the limited privilege afforded to contracting parties.

       i.    <u>Tortious Interference with Contract</u>

A claim for tortious interference consists of the following elements: (a) the existence of a contract, (b) about which the defendant knew, (c) an intentional act that is a significant factor in causing the beach of such contract, (d) without justification, and (e) which causes injury. *In re CVR Refining, LP Unitholder Litigation*, 2020 WL 506680 (Del. Ch. Jan. 31, 2020) (citing *WaveDivision Holdings, LLC v. Highland Capital Management, L.P.*, 49 A.3d 1168, 1174 (Del. 2012). A defendant can be liable for tortious interference if there is an underlying breach of an express or implied contractual obligation. *Id.* (citing *Nama Holdings, LLC v. Related WMC LLC*, 2014 WL 643667, at *25 (Del. Ch. Nov. 17, 2014).

A critical problem with Defendant's argument is its erroneous assumption that the "contract" at issue is a draft license agreement that was never finalized – the "Qilu License Agreement". Relying on this faulty premise, Cipla argues that the claim must fail because it could not have interfered with a contract that never existed. Cipla misinterprets the Complaint. It is Qilu's agreement to purchase the China Assets from Achaogen – the "Qilu Agreement" – with which Cipla wrongfully interfered to the point that Qilu walked away from its obligation to purchase.

The Qilu Agreement was formed at the June 3 Auction when Achaogen accepted Qilu's bid to purchase the China Assets. It is well-settled that a bid at auction serves as an offer for which the seller has the ability to accept. Upon designation of a successful bidder, acceptance

has been accomplished and a contract is formed. R. Lord, *Williston on Contracts* § 4:12 (4th ed.) ("a binding contract is formed between the bidder and the auctioneer upon acceptance of the bid, and the bidder may not thereafter withdraw"). This is so although the sale itself is subject to approval by the court. *Id.* Thus, a buyer in a judicial sale is bound by his bid until the court either approves or disapproves it. *Camden v. Mayhew*, 129 U.S. 73, 83, 9 S.Ct. 246, 248, 32 L.Ed. 608 (1889); *Freehill v. Greenfeld*, 204 F.2d 907, 908-09 (2d Cir. 1953) ("an accepted bid at a judicial sale, subject to confirmation, binds the bidder, though it does not bind the court. It is to be considered as a contract concluded between the parties, but subject to the consent of a third person; indeed, it would otherwise be difficult to conduct judicial sales at all."); *Matter of Fairfield General Corp.*, 75 N.J. 398, 411, 383 A.2d 98, 105 (Sup. Ct. N.J. 1978) (pointing to "overwhelming authority supports the proposition that once the purchaser makes a bid which is agreed to by the seller, or he signs an agreement to purchase, he is bound to complete the purchase and to pay the agreed consideration unless the court, in refusing to confirm the sale, relieves him of his bid"); *but see In re Susquehanna Chemical Corp.*, 92 F. Supp. 917, 920 (W.D. Pa. 1950) (finding no contract between bankruptcy trustee and bidder until court approves sale).

To be clear, Cipla is correct insofar as the Complaint contains allegations that it also interfered with efforts to finalize a license agreement, and that Cipla's bad faith conduct led to the failure of those negotiations. However, the contract at issue in Plaintiff's claim for tortious interference with contract is the Qilu Agreement, which Qilu breached as a result of Cipla's intentional interference.

Consistent with this view, the Complaint contains sufficient factual allegations in support of both the existence of a contract between Achaogen and Qilu as well as Cipla's unjustified

7

interference, which included the bad faith conduct that led to failed negotiations concerning the Qilu License Agreement. Among other allegations:

(a) The existence of a contract:

> 122. At the June 3 Auction, Cipla was designated as the Successful Bidder for the Global Rights excluding the China Assets and Qilu was designated as the Successful Bidder for the China Assets. Cipla was also designated as the Back-up Bidder for the China Assets.

> 123. As the Successful Bidder for the China Assets, Qilu had an agreement with Achaogen and was obligated to purchase the China Assets from Achaogen (the "Qilu Agreement"), which rights were to be conveyed by way of the Qilu License Agreement.

(b) About which the Defendant knew:

> 122. Having participated in the June 3 Auction and being designated as Back-Up Bidder for the China Assets, Cipla was aware of Qilu's agreement with Achaogen to purchase the China Assets in the form of a license.

(c) An intentional act that is a significant factor in causing the breach of such contract:

> 126. Cipla interfered with the Qilu Agreement by delaying and acting unreasonably in negotiations concerning the Qilu License Agreement.

> 127. Cipla intentionally delayed and made unreasonable demands in negotiations concerning the Qilu License Agreement in order to give Cipla time to scour the Chinese market to determine the resale value of the China Assets.

> 128. Cipla's conduct during negotiations concerning the Qilu License Agreement was a significant factor contributing to Qilu's ultimate refusal to consummate the Qilu License Agreement and repudiation of its bid for the China Assets.

> 65. On July 22, 2019, nearly seven weeks after the June 3 Auction, Qilu's counsel informed Cassel, Achaogen's investment banker, that it may be in Achaogen's best interest to sell the China Assets to Cipla rather than continue to negotiate the Qilu License Agreement. Qilu's counsel cited the difficulties Cipla was creating in the negotiations over the Qilu License Agreement, its belief that Cipla had not been acting in good faith, and its incurred and anticipated costs in connection with negotiations, as the primary factors for its desire to walk away from the transaction.

(d) Without justification:

8

124.    Cipla had no justification for disrupting negotiations over the Qilu License Agreement.  For example, the Global Rights for which Cipla was the Successful Bidder expressly excluded the China Assets, such that Cipla's unwillingness to convey to Qilu a perpetual license or rights to sublicense in China were unreasonable and contrary to Qilu's agreement with Achaogen to purchase the China Assets.

125.    Cipla's failure to negotiate in good faith and use commercially reasonable efforts to finalize the Qilu License Agreement was in violation of its obligations under the Cipla Plazomicin Sale Agreement and Cipla Sale Order.

(e) Which causes injury:

131.    As a result of Cipla's tortious interference, Achaogen was unable to reach agreement with Qilu on the Qilu License Agreement and Qilu walked away from its bid for the China Assets.

72.    On July 31, 2019, counsel for Cipla informed the Court that it would not be fulfilling its obligation to purchase the China Assets as the Back-up Bidder.

76.    After learning of Cipla and Qilu's respective decisions to walk away from their various obligations under the Cipla Plazomicin Sale Agreement, the Bidding Procedures Order, Cipla C-Scape Sale Agreement and the Cipla Sale Order, as applicable, Achaogen devoted significant time and resources to finding alternative buyers for the China Assets and C-Scape.

77.    After months of searching and communicating with interested parties, Achaogen identified XuanZhu (HK) Biopharmaceutical Limited ("XuanZhu") as a potential buyer for the China Assets.

78.    While attempting to mitigate the damages it suffered at the hands of Cipla, the consideration contemplated in the sale to XuanZhu was far less than the consideration offered by Cipla in its Back-up Bid.

79.    The Court ultimately approved the sale of the China Assets to XuanZhu for the amount of $4,500,000.00.

132.    As a result of Cipla's tortious interference, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

In summary, because the Complaint plausibly demonstrates that Cipla tortiously interfered with a contract between Achaogen and Qilu, the Motion to Dismiss should be denied as to this claim.

9

ii.  Tortious Interference with Business Relations and Prospective Economic Advantage

Similar to the claim for tortious interference with contract, Counts V and VI focus on Cipla's disruptive efforts to undermine the planned sale of the China Assets to Qilu.  The scope of these claims extends beyond the Qilu Agreement itself to the business relations between Qilu and Achaogen as a whole.  Claims for tortious interference with business relations and prospective economic advantage feature the same elements and, for purposes of this Response, Plaintiff addresses them collectively.

Under Delaware law, in order to state a claim for tortious interference with business relations and/or prospective economic advantage, a plaintiff must allege: "(a) the reasonable probability of a business opportunity, (b) intentional interference with that opportunity, (c) proximate causation, and (d) damages." *Preston Hollow Capital LLC v. Nuveen LLC,* 2020 WL 1814756, at *12 (Del. Ch. Apr. 9, 2020); *KT4 Partners LLC, et al. v. Palantir Technologies, Inc., et al.*, 2018 WL 4033767, at *6 (Del. Super. Aug. 22, 2018).  As part of either claim, the plaintiff must allege that defendant's conduct was wrongful.  *Id.*

In support of each element, the Complaint contains sufficient allegations to show that relief is plausible, including among them:

(a)  Reasonable probability of a business opportunity

24.  Achaogen commenced an auction for the sale of its assets on June 3, 2019 (the "June 3 Auction").  The June 3 Auction was for substantially all assets other than C-Scape.

10

26.     While no parties appeared able or interested in topping Cipla's bid for the Global Rights, Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") submitted a bid for a perpetual, irrevocable, exclusive, royalty-and-milestone-payment-free, and sublicensable license of the rights to develop, commercialize and manufacture the compound and the product of Plazomicin in the People's Republic of China, Hong Kong, Macau and Taiwan (the "China Assets"). A copy of Qilu's bid package is attached hereto as **Exhibit D**.

30.     While Cipla outbid Altamont, it did not outbid Qilu for the China Assets. After multiple rounds of bidding, Achaogen, in consultation with the DIP Lender and the Committee, designated (i) Cipla's bid of $4.65 million[13] as the Successful Bid for the Global Rights subject to a license agreement for the China Assets and (ii) Qilu's bid of $8.5 million as the Successful Bid for the China Assets. Cipla's bid of $8.4 million was designated as the Back-up Bid to Qilu's winning bid for the China Assets.

31.     It was agreed and understood by the parties at the June 3 Auction that Qilu was to receive a perpetual, irrevocable, exclusive, and royalty-free license, with the right to grant sublicenses for the China Assets (the "Qilu License Agreement").

133.     The anticipated sale of the China Assets to Qilu by way of the Qilu License Agreement was a business opportunity for which Achaogen stood to gain financially.

134.     It was highly likely that Qilu would have consummated the purchase of the China Assets because of the obligations to close imposed on Qilu by operation of the Bidding Procedures Order and Qilu's participation in the June 3 Auction, including its agreement to become the Successful Bidder.

(b)     Intentional interference with that opportunity

136.     Cipla was aware of the Qilu Agreement for the purchase of the China Assets by way of the Qilu License Agreement.

138.     Cipla tortiously interfered with Achaogen's business relations with Qilu by negotiating the Qilu License Agreement in bad faith, and surreptitiously seeking marketing and sale opportunities for the China Assets.

---

[13] In addition to this upfront cash consideration, Cipla's winning bid was also comprised of (i) the assumption of certain contractual liabilities and (ii) additional contingent consideration, including non-contingent guaranteed minimum payments equaling $2.7 million over the next 10 years.

61299/0003-41547250v1

37.     On June 4, 2019, Achaogen sent Qilu's draft of the license agreement ("Qilu's Draft License") that Qilu had submitted with its bid to Cipla for review. Despite several requests by both Achaogen and Qilu for Cipla's comments on an expedited basis, Cipla did not revert with comments until June 17, 2019 ("Cipla's Draft License").

38.     The Cipla's Draft License was remarkably different from the Qilu Draft License. Among other changes, Cipla removed several rights afforded to Qilu in the Form License Agreement including: (i) a perpetual license, (ii) the right to sublicense the China Assets, (iii) the right of reference to licensor regulatory documentation, (iv) ownership of China Plazomicin trademarks and (v) the ownership of inventions developed by Qilu.

39.     On June 18, 2019, upon its review of Cipla's Draft License, Qilu's counsel communicated to Achaogen through email its displeasure with the extensive changes made in Cipla's Draft License. *See* **Exhibit F**. Qilu's counsel claimed that Cipla's Draft License "greatly deviated from the draft provided by [Achaogen] and have drastically taken back what was offered for sale by Achaogen." *Id*. Further, Qilu's counsel expressed concerns that Cipla may not be negotiating in good faith in light of its overly aggressive markup of Qilu's Draft License. *Id*.

40.     From Qilu's perspective, Cipla "abused" the opportunity to be part of the Qilu License Agreement negotiations by substantially rewriting key sections of Qilu's Draft License. While Cipla claimed that it was prepared to assist Achaogen and Qilu to consummate the Qilu License Agreement, Cipla's actions rendered its words merely empty promises.

139.    Cipla intentionally interfered with the sale of the China Assets to Qilu with the hope of buying the China Assets directly from Achaogen and then reselling the China Assets for a profit.

150    Cipla's actions impeded negotiations with Qilu and Qilu ultimately refused to consummate the Qilu License Agreement, repudiating its bid for the China Assets.

151.    Cipla tortiously interfered with Achaogen's business relations with Qilu by negotiating the Qilu License Agreement in bad faith, and surreptitiously attempting to sell the China Assets to a third party who may have been willing to pay more.

72.     Cipla treated its contractual obligation[14] to purchase the China Assets as though it were a mere option that would allow it to gauge the resale value of the asset before taking on the risk of owning it.  Rather than honor its obligations under the Bidding Procedures Order and Cipla Sale Agreements, Cipla appears to have delayed negotiations with Qilu in order to give itself time to find a buyer willing to pay an amount above Cipla's bid.  If successful, Cipla's delay tactics would likely have resulted in Qilu withdrawing its bid (which occurred), Cipla purchasing the China Assets as the Back-up Bidder, and Cipla having the opportunity to sell the asset to a third party for a quick profit.  In short, Cipla's bid was a play for time to scour the Chinese market's appetite for Plazomicin.  However, Cipla's search did not yield the results it was seeking.

(c)     Proximate causation

65.     On July 22, 2019, nearly seven weeks after the June 3 Auction, Qilu's counsel informed Cassel, Achaogen's investment banker, that it may be in Achaogen's best interest to sell the China Assets to Cipla rather than continue to negotiate the Qilu License Agreement.  Qilu's counsel cited the difficulties Cipla was creating in the negotiations over the Qilu License Agreement, its belief that Cipla had not been acting in good faith, and its incurred and anticipated costs in connection with negotiations, as the primary factors for its desire to walk away from the transaction.

140.     Cipla's tortious interference disrupted negotiations with Qilu over the Qilu License Agreement, and Achaogen was ultimately unable to reach agreement with Qilu on the Qilu License Agreement resulting in Qilu walking away from its bid.

141.     Cipla's conduct in negotiations over the Qilu License Agreement was a significant factor in Qilu's decision to walk away from its obligation to purchase the China Assets.

142.     If Cipla had negotiated the Qilu License Agreement in good faith and using commercially reasonable efforts, it is likely that Achaogen would have consummated the sale of the China Assets to Qilu, in which case Achaogen would have realized $8.5 million in sale proceeds from Qilu.

158.     As a result of Cipla's conduct, Achaogen lost out on the prospective economic advantage that would have resulted from a sale of the China Assets to Qilu.

(d)     Damages

---

[14] The contractual obligation referenced in Paragraph 72 is Cipla's obligation as back-up bidder.

143.	As a result of Cipla's tortious interference, Achaogen incurred expense and lost proceeds among other damages in an amount to be determined at trial.

(e)	Wrongful conduct

Defendant's primary contention appears to be that Cipla's conduct, no matter how egregious, could never result in culpability for tortious interference because of its purportedly close proximity to Achaogen and Qilu.  More specifically, and although Defendant was not a party to the Qilu Agreement itself, Defendant argues that its role in negotiations regarding the Qilu License Agreement bestowed upon it an absolute privilege to compete with Qilu for the China Assets irrespective of its conduct.  As support for its position, Defendant cites the "stranger rule" articulated in *Tenneco Automotive, Inc. v. El Paso Corp.,* 2007 WL 92621 (Del. Ch. Jan. 8, 2007).  This argument is misplaced for several reasons.

1. Cipla is Liable for Tortious Interference Regardless of its Relationship to Achaogen and Qilu

Defendant's reliance on *Tenneco* is misguided.  The Delaware decisions following *Tenneco* characterize its application of the "stranger rule" as a far-too-broad, bright-line interpretation which "runs contrary to the Delaware Supreme Court's adoption of the multi-factor balancing approach under Section 766."  *Bandera Master Fund LP v. Boardwalk Pipeline Partners LP*, C.A. No. 2018-0372-JTL, 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019).

Under Delaware law, a defendant can be liable for tortious interference whether or not it is a stranger to the contract or business relationship underpinning the contract at issue.  *Id.*; *In re CVR Refining, LP Unitholder Litigation*, C.A. No. 2019-0062-KSJM, 2020 WL 506680 (Del. Ch. Jan. 31, 2020).  In circumstances where a party related to the transaction at issue is charged with tortious interference, courts in Delaware conduct a balancing test to measure the degree of interference against the relatedness of the party.  *Boardwalk Pipeline,* 2019 WL 4927053, at 28.

14

This "limited privilege" approach, prescribed in Restatement (Second) of Torts § 767, examines several factors:

(a)     The nature of the actor's conduct,

(b)     The actor's motive

(c)     The interests of the other with which the actor's conduct interferes

(d)     The interests sought to be advanced by the actor

(e)     The social interests in protecting the freedom of action of the actor and the contractual interests of the other

(f)     The proximity or remoteness of the actor's conduct to the interference, and

(g)     The relations between the parties

As is evident from this multi-factor test, justification is a fact-specific inquiry. *In re CVR Refining, LP Unitholder Litigation*, C.A. No. 2019-0062-KSJM (Jan. 31, 2020) (citing *Boardwalk*, at *29).

The allegations in the Complaint, taken as true, leave no doubt that Cipla's conduct was inexcusable. As alleged, Cipla intentionally delayed negotiations regarding the Qilu License Agreement in order to scour the Chinese market for the resale value of the China Assets and, if it found an opportunity for profit, to force Qilu out of the Qilu Agreement.[15] It also breached its obligations to act in good faith and with commercially reasonable efforts in finalizing the Qilu License Agreement.[16] In so doing, Cipla failed to honor the sanctity of the judicial sale process, treating its status as back-up bidder as a small hindrance to its goal of turning a profit off of the

---

[15] Complaint ¶¶ 73, 152-153.

[16] Complaint ¶ 115.

China Assets.[17]   In contrast, Cipla's "relatedness" to Qilu's purchase of the China Assets was indirect at best.  Cipla was not a party to the Qilu Agreement and did not have an economic interest in the China Assets.  Cipla's only connection to the China Assets transaction was its anticipated role as licensor and its corresponding involvement in negotiations concerning the license agreement.  Cipla claims that it was "merely protecting its own interests in negotiations." However, any such belief on the part of Cipla is unfounded and contrary to the record in the case and the allegations in the Complaint.  Because the license was to be perpetual, irrevocable and exclusive, Cipla could claim no material interest in the China Assets and acted without justification by attempting to limit Qilu's rights in the China Assets. [18]

Ultimately, whether Defendant can rebut Plaintiff's well-pleaded facts by establishing justification for its actions is a fact-intensive inquiry not ripe for determination at the pleading stage of this case.

2. *Tenneco* is Not Applicable to Claims for Tortious Interference with Business Relations and Prospective Economic Advantage

Even if the Court were inclined to follow the rationale in *Tenneco* by recognizing absolute immunity for tortious interference to parties to the same contract, the *Tenneco* decision is distinguishable because it has no bearing on claims for tortious interference with business relations or prospective economic advantage.  At issue in *Tenneco* was whether plaintiff could bring a claim for tortious interference **with contract** against a company that was also a party to the contract at issue.   The *Tenneco* court, relying on a case out of Georgia, held that a company cannot be liable for tortious interference with contract if it is a stranger to both the contract and

---

[17] Complaint ¶ 116-117.

[18] Complaint ¶¶ 31, 129.

the business relationship underling the contract. *Id.* at \*5. The court reasoned that, "after all, a defendant cannot interfere with its own contract." *Id.* This rationale is simply not relevant to Plaintiff's claims for tortious interference with business relations and prospective economic advantage, which are non-contractual claims.

### 3. Cipla was Not a Party to the Qilu Agreement

To the extent Defendant seeks application of *Tenneco* as against Plaintiff's claim for tortious interference with contract, the absolute privilege does not apply to Defendant which was not a party to the Qilu Agreement or the business relationship underlying that contract. The respective rights of the parties to the Plazomicin asset were determined by auction, with Cipla securing the global rights with the exception of the China Assets, and Qilu securing the China Assets. Thus, Cipla was not a party to and otherwise had no interest in the Qilu Agreement. Cipla's status as back-up bidder does not render it a party to Qilu's agreement to purchase the China Assets. Nor does Cipla's role in negotiations for a license exclude it from liability. Although Cipla became involved in negotiations regarding the terms of the Qilu License Agreement,[19] Cipla never had an economic interest in the China Assets beyond the *de minimus* rights of a licensor of a perpetual, irrevocable, exclusive and royalty-free license.

Finally, Cipla asks the court to reject as "speculative" allegations that Qilu would have purchased the China Assets but for Cipla's interference. However, it is the unfulfilled prospect of a deal materializing that serves the basis for relief under claims for tortious interference with business relations or prospective economic advantage. Cipla cannot circumvent liability by claiming that Achaogen's deal with Qilu never actually materialized, when it was Cipla's

---

[19] Complaint ¶¶ 32-40.

17

interference that caused the deal to break down. In any event, the likelihood of a deal between Achaogen and Qilu was hardly speculative; Qilu was the successful bidder for assets at auction.

C. The Claim for Promissory Estoppel (C-Scape) is Properly and Sufficiently Pled as an Alternative Theory for Relief

The doctrine of promissory estoppel is a quasi-contractual remedy "designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *Trueblue, Inc. et al. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726 (Del. Super. Sept. 25, 2015). Promissory estoppel acts as a consideration substitute for promise which are reasonably relied upon, but which would otherwise not be enforceable. *In re FAH Liquidation Corp.*, 581 B.R. 98, 116 (Bankr. D. Del. 2017). Promissory estoppel is present where: (1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and acted to his detriment; and (4) such a promise is binding because injustice will be avoided only by enforcement of the promise. *Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

Plaintiff's claim for promissory estoppel is pled as an alternative theory for relief to Plaintiff's claim for breach of the Cipla C-Scape Sale Agreement. Plaintiff is entitled to plead alternative theories for relief, especially where there is room for doubt as to the enforceability of the competing claim.[20] Although Defendant apparently concedes that the breach of contract claim regarding C-Scape was sufficiently pled, Defendant forecasts in its introductory paragraph that it will dispute the breach of contract claim.[21] To the extent that Cipla should argue, or it is

---

[20] *See, e.g., In re FAH Liquidation Corp.*, 581 B.R. at 116 (denying motion to dismiss claim for promissory estoppel which was pled in the alternative to a breach of contract claim).

[21] *Defendant's Brief, p. 1* [Adv. Dkt. No. 10]

otherwise determined, that no enforceable contract was in place as between Achaogen and Cipla, or that there is some contract formation problem that would otherwise prevent the enforcement of C-Scape's obligation to purchase C-Scape, Plaintiff is entitled to relief under the quasi-contractual remedy of promissory estoppel.

Additionally, the claim for promissory estoppel is buttressed by well-pleaded allegations of fact showing that entitlement to relief is plausible. Cipla agreed to purchase C-Scape from Achaogen for $1,200,000.00 and entered into the Cipla C-Scape Sale Agreement.[22] The Cipla C-Scape Sale Agreement provided that the sale of C-Scape was scheduled to close on or prior to the C-Scape Outside Date.[23] Cipla then promised Achaogen that it would proceed with closing the Cipla C-Scape Sale Agreement even after the C-Scape Outside Date had passed.[24] Achaogen reasonably relied on this promise as Cipla had already manifested its commitment to purchase C-Scape at auction and through an asset purchase agreement.[25] Achaogen relied on Cipla's promise to its detriment, as Achaogen declined other opportunities to sell or market C-Scape.[26] Achaogen suffered injustice when Cipla did not follow through on and ultimately backed out of its agreement to purchase C-Scape, resulting in a lost sale.

Cipla's contention that the claim for promissory estoppel is merely speculative is perplexing. In addition to the well-pleaded factual allegations in support of each element of the claim, which are summarized above, the Complaint contains numerous allegations, with

---

[22] Complaint ¶ 45.

[23] Complaint ¶ 174.

[24] Complaint ¶ 175.

[25] Complaint ¶¶ 45, 178

[26] Complaint ¶ 178.

supporting exhibits, detailing Cipla's motive for backing out of a C-Scape purchase. For example:

> 55.    By July 2019, Achaogen started to receive mixed signals from Cipla regarding its willingness to close the C-Scape transaction. On July 15, 2019, Nishant Saxena, Cipla's Global Chief Strategy Officer, told two separate Achaogen principals that "Looks like on C-Scape, the call with government did not go well. Neither is the $6m committed that we were counting on, nor are they absolving Cipla of past liabilities clawback. Maybe just opt out of C-Scape?" A text message exchange between Mr. Saxena and Blake Wise, the Debtor's Chief Executive Officer, is attached hereto as **Exhibit H**. The following day, Mr Saxena stated that "I understand the barda contract expired in July (I didn't know). The extension till September is on no costs modification basis (which means incremental $6+6m of funding in data room is not there anymore) … On C-Scape, we can talk … Worst case, if you want to go with backup that's fine too." A text message exchange between Mr. Saxena and Nick Campbell, the Managing Partner for MERU, LLC, a professional employed by the Debtor, is attached hereto as **Exhibit I**.

> 56.    Despite Mr. Saxena saying that Cipla was "unlikely" to go ahead with C-Scape (see text message exchange between Mr. Saxena and Mr. Campbell, attached hereto as **Exhibit J**), Nikhil Lalwani, Cipla's Chief Executive Officer for North America, repeatedly assured Achaogen that Cipla would consummate both Cipla Sale Agreements.

> 57.    On or about July 24, 2019, and following the removal of C-Scape from the sale order, Cipla alerted Achaogen that it was not ready to proceed with its acquisition of C-Scape despite its commitment to do so as the Successful Bidder.

> 58.    On information and belief, Cipla did not move forward with the C-Scape transaction because Cipla learned it would not receive BARDA funding for C-Scape. Thus, Cipla's interest in C-Scape was apparently subject to the Government's willingness to finance its development.

> 59.    Nonetheless, such a decision should not and could not have served as a reason for Cipla to not fulfill its obligations as the Successful Bidder for C-Scape. Cipla was well aware that BARDA funding was not guaranteed and was not required as a closing condition under the Cipla C-Scape Agreement that it executed with Achaogen.

Similarly, the injury suffered by the estate as a result of Cipla's conduct is more than just speculation. After committing to purchase C-Scape at auction on June 12, 2018, Cipla delayed negotiations with Achaogen over a sale order over the course of several weeks, before ultimately

20

backing out more than one month after the auction, on July 24, 2019.[27] During that interim period, the Government announced that it would not be renewing its BARDA contract with Achaogen.[28] This caused the value of C-Scape to deteriorate.[29] Despite subsequent efforts to secure a replacement buyer, neither Achaogen nor the Trustee has been successful in liquidating the C-Scape asset.[30] Rather than receiving $1,200,000.00 from Cipla, the estate has received nothing for the C-Scape asset. While the precise amount of damages suffered by the estate will be determined at trial, the Complaint plausibly demonstrates injury as a result of Achaogen's detrimental reliance on Cipla.

   D. The Well-Pleaded Allegations in the Complaint Support Relief for Breach of Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing embodies the law's expectation that "each party to a contract will act with good faith toward the other with respect to the subject matter of the contract." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006). The doctrine is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *In re FAH Liquidation Corp.*, 581 B.R. at 115 (citing *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)). It applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017). Delaware courts have articulated the test as follows: "is it clear

---

[27] Complaint ¶¶ 43-44, 49-59.

[28] Complaint ¶ 53.

[29] Complaint ¶ 179.

[30] Complaint ¶¶ 80, 181.

21

from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to the matter?" *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d at 1032. Thus, parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms. *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d at 442. While the implied covenant of good faith and fair dealing attaches to every contract, a party "cannot base a claim for breach [ ] on conduct authorized by the terms of the agreement." *In re FAH Liquidation Corp.*, 581 B.R. at 115 (citing *Dunlap v. State Farm Fire & Cas. Co., 878 A.2d at 441).* If such actions are addressed in the contract at issue, the implied covenant of good faith and fair dealing does not apply. *Id.*

Defendant appears to argue that the Implied Covenant Claim should be dismissed because it would circumvent the express terms in the Cipla Plazomicin Sale Agreement and the Cipla C-Scape Sale Agreement.[31] Defendant essentially argues that there are no gaps in these agreements and their terms should exclusively dictate whether Defendant acted in accordance with them.

Defendant's argument is once again based on a false premise. Whereas Cipla relies on the Cipla Plazomicin Sale Agreement to control its rights vis-à-vis the China Assets including the right to terminate, the Cipla Plazomicin Sale Agreement is an Asset Purchase Agreement for the global rights to Plazomicin **subject to a license for the China Assets**. *See* Compl., *Ex. E* §§ 2.1, 2.5. At the time of its execution, on June 20, 2019, Qilu's successful bid was in effect and Achaogen was working toward closing on the sale of the China Assets to Qilu. In fact, the Cipla

---

[31] *Def. Brief,* pp. 14-15.

Plazomicin Sale Agreement assumes that Qilu is the "China Licensee." Compl., *Ex. E* § 1.1. While the Cipla Plazomicin Sale Agreement does obligate Cipla to cooperate in efforts to finalize and convey a license for the China Assets to the China Licensee,[32] it does not represent an agreement to purchase the China Assets or grant to Cipla (or Qilu, for that matter) the right to cancel its obligation to purchase the China Assets. As a result, it is far from clear what (if any) termination rights Cipla possessed with respect to its obligation to purchase the China Assets following its designation as successful bidder.

Moreover, and as recited in more detail, above, the Complaint is rife with allegations that Cipla's conduct "frustrated the fruits of the bargain that [Achaogen] reasonably expected." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017). Therefore, especially at this initial pleading stage in the case, the Implied Covenant Claim as to Cipla's obligation to purchase the China Assets must survive.

Separately and in contrast to Cipla's obligation to purchase the China Assets, the Cipla C-Scape Agreement includes express conditions precedent and termination rights. However, the allegations in the Complaint plausibly demonstrate that Cipla acted unreasonably and arbitrarily by intentionally delaying and making false promises regarding the C-Scape purchase before ultimately reneging on its agreement. Although the Complaint refers to the Government's failure to renew BARDA funding and a problem with financing as potential motives behind Cipla's decision to walk away from its purchase agreement,[33] it remains to be seen what arguments Cipla will assert in its defense and the extent to which its explanation would violate the implied

---

[32] *Ex. E,* § 5.17.

[33] Complaint ¶ 55.

covenant of good faith and fair dealing. In light of the well-pleaded allegations of bad faith and the early stage of this proceeding, the Motion to Dismiss should be denied.

### E. Plaintiff's Claim for Civil Contempt is Proper

Defendant contends that there is no private right of action for civil contempt and therefore Count X should be dismissed. However, courts in the Third Circuit recognize a cause of action for civil contempt of court. In order to establish liability for civil contempt, a plaintiff must prove three elements by clear and convincing evidence: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order. *In re Safety-Kleen*, 331 B.R. 605, 608 (Bankr. D. Del. 2005) (citing *Roe v. Operation Rescue,* 54 F.3d 133, 137 (3d Cir.1995)).

There are numerous examples where the Delaware Bankruptcy Court has recognized a claim for civil contempt. *See, e.g., In re Safety-Kleen*, 331 B.R. 605 (Bankr. D. Del. 2005) (claim for civil contempt based on alleged violation of bankruptcy sale order); *In re Hechinger Investment Co. of Delaware, Inc.*, 282 B.R. 149, 158 (Bankr. D. Del. 2002) (denying motion to dismiss claim for civil contempt for violation of order); *In re WCI Communities, Inc.,* 2012 WL 1981713, at *8 (Bankr. D. Del. Jun. 1, 2012) (denying motion to dismiss claim for civil contempt for violation of confirmation order); *In re Managed Storage International, Inc.*, 601 B.R. 261, 269 (Bankr. D. Del. 2019) (concluding that claimant had high probability of success on a contempt action).

To the extent the Court determines that Plaintiff lacks a private right of action for sanctions for civil contempt, Plaintiff reserves the right to request by motion that the Court consider imposing such sanctions as are warranted under Section 105 of the Bankruptcy Code.

24

## CONCLUSION

In summary, the well-pleaded Complaint more than satisfies the *Twombly/Iqbal* standards and the Motion to Dismiss should be denied in its entirety. In the alternative, and to the extent any further information is necessary to supplement the allegations in the Complaint at this time, the Trustee respectfully requests that this Objection be treated as a motion for leave to amend the Complaint and replead with even greater specificity.

WHEREFORE, the Trustee respectfully requests that the Court deny the Motion to Dismiss and grant such other and further relief as the Court deems just and proper, including, but not limited to, granting the Trustee leave to amend the Complaint to the extent necessary.

September 10, 2021
Wilmington, Delaware

**COLE SCHOTZ P.C.**

By: */s/ Andrew Roth-Moore*
Justin R. Alberto (No. 5126)
Andrew Roth-Moore (No. 5988)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Email: jalberto@coleschotz.com
        aroth-moore@coleschotz.com

*-and-*

Nicholas C. Brown, Esq., NC SBN 38054
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (877) 746-4275
Fax: (651) 406-9676
Email: nbrown@askllp.com

*-and-*

Edward E. Neiger, Esq.
ASK LLP
60 East 42nd Street, 46th Fl.
New York, New York 10165
Telephone: (212) 267-7342

*Counsel for Edward E. Neiger, in his Capacity as Plan Trustee of the Achaogen Plan Trust*

25

26