IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Achaogen, Inc. | Case No. 19-10844 (BLS) |
| Debtors. | |
| Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust, | |
| Plaintiff, | Adv. Proc. No. 21-50479 (BLS) |
| v. | |
| Cipla USA, Inc. | **Re: Adv. Docket No. 1** |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF CIPLA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Dated: February 15, 2024

Jeremy W. Ryan (No. 4057)
John A. Sensing (No. 5232)
Jesse L. Noa (No. 5973)
Andrew L. Brown (No. 6766)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
  jsensing@potteranderson.com
  jnoa@potteranderson.com
  abrown@potteranderson.com

*Attorneys for Cipla USA, Inc.*

# TABLE OF CONTENTS

                                                         **Page**

NATURE AND STAGE OF PROCEEDING ...................................................................1

SUMMARY OF ARGUMENT .........................................................................................1

STATEMENT OF FACTS .................................................................................................2

    Debtor's Assets..........................................................................................................2

    The Bankruptcy and Bidding Procedures Order .......................................................3

    The June 3, 2019 Auction..........................................................................................3

    The Plazomicin Sale Agreement and Sale Order .....................................................4

    Cipla Negotiates in Good Faith, but Debtor Allows Qilu to Walk Away ................5

    The C-Scape Assets and Sale Agreement .................................................................6

ARGUMENT......................................................................................................................7

    I.     Cipla's Liability for the China Assets is Capped at its $350,000 Deposit................8

    II.    Cipla's Liability for C-Scape is Capped at its $50,000 Deposit ..................................10

    III.   Plaintiff is Not Saved by the Tortious Interference Claims.........................................11

CONCLUSION.................................................................................................................12

# TABLE OF AUTHORITIES

                                                                                 Page(s)

**Cases**

*In re Achaogen Inc.*,
  Case No. 19-10844, D.I. 574 (Bankr. D. Del. Jan. 9, 2020) ........................................................ 8

*Alcoa, Inc. v. Alcan Rolled Products-Ravenswood LLC*,
  2020 WL 1180713 (D. Del. Mar. 11, 2020) ................................................................................ 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................................... 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................................................... 7

*Citisteel USA, Inc. v. General Elec. Co.*,
  78 Fed.Appx. 832 (3d Cir. 2003) ................................................................................................ 8

*Coffman v. Federal Laboratories*,
  171 F.2d 94 (3d Cir. 1948) .......................................................................................................... 7

*Delaware Limousine Serv., Inc.v Royal Limousine Serv., Inc.*,
  1991 WL 53449 (Del. Super. Apr. 5, 1991) ........................................................................... 9, 11

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*,
  209 F.3d 252 (3d Cir. 2000) ...................................................................................................... 10

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
  817 A.2d 160 (Del. 2002) .......................................................................................................... 11

*In re Governor's Island*,
  45 B.R. 247 (Bankr. E.D.N.C. 1984) .......................................................................................... 9

*In re Klemen*,
  22 B.R. 757 (Bankr. N.D. Ill. 1982) ........................................................................................... 9

*O'Brien v. Progressive N. Ins. Co.*,
  785 A.2d 281 (Del. 2001) ........................................................................................................... 8

*Pollock v. Am. Tel. & Tel. Long Lines*,
  794 F.2d 860 (3d Cir. 1986) ....................................................................................................... 7

*Tamarind Resort Assocs. v. Virgin Islands*,
  138 F.3d 107 (3d Cir. 1998) ....................................................................................................... 8

*Zemenco, Inc. v. Developers Diversified Realty Corp.*,
 205 Fed. App'x. 82 (3d Cir. 2006) ................................................................................9

**Statutes**

Federal Rule of Bankruptcy Procedure Rule 7056 ....................................................................1, 7

Federal Rule of Civil Procedure Rule 56 ...................................................................................1, 7

Defendant, Cipla USA, Inc. ("Cipla" or "Defendant"), by and through its undersigned counsel, hereby submits this Memorandum in support of its motion (the "Motion")[1] for partial summary judgment as to liability pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable hereto by Rule 7056 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## NATURE AND STAGE OF PROCEEDING

On April 15, 2019 (the "Petition Date"), the Debtor filed voluntary petitions under Chapter 11 of the Bankruptcy Code. On May 27, 2021, the Plaintiff filed his *Complaint* [Adv. D.I. 1] (the "Complaint") against Cipla. The Complaint asserted ten counts against Cipla: (I) breach of contract, (II) breach of oral contract, (III) breach of contract – bad faith, (IV) tortious interference with contract, (V) tortious interference with business relations, (VI) tortious interference with prospective economic advantage, (VII) breach of contract (C-Scape), (VIII) promissory estoppel (C-Scape), (IX) breach of implied covenant of good faith and fair dealing, and (X) contempt. On August 6, 2021, Cipla filed a partial motion to dismiss counts I, IV, V, VI, VIII, IX, and X of the Complaint and accompanying brief [Adv. D.I. 9, 10] (the "Motion to Dismiss"). On January 30, 2023, the Court granted Cipla's Motion to Dismiss as to count IV, and denied the remainder of the relief sought [Adv. D.I. 26]. On February 27, 2023, Cipla filed an answer to the Complaint [Adv. D.I. 29] (the "Answer").

## SUMMARY OF ARGUMENT

The Plan Trustee of the Achaogen Plan Trust ("Plaintiff"), as successor in interest to Debtor Achaogen, Inc. ("Achaogen" or "Debtor"), alleges a variety of claims in this action, relating to Cipla's termination of its obligation as the successful bidder and as back-up bidder to purchase

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meaning ascribed to them in the Motion.

1

certain assets of Debtor (the "China Assets" and "C-Scape," as defined below). Cipla believes it properly terminated its obligations under the parties' two purchase agreements based on Debtor's breaches of its representations and warranties and Debtor's own failures to properly perform. However, even if the Court ultimately finds that Cipla was not entitled to terminate those obligations, Plaintiff cannot recover more than the deposits provided by Cipla due to the applicable limitations in the bidding procedures, bidding procedures order and asset purchase agreements, all of which were prepared by the Debtor. This issue is purely based on the contractual language of the applicable documents attached to the Complaint, and thus is ripe for decision at this stage. Further, the basis for the parties' amended case schedule was to submit this motion for adjudication at this stage. Nothing in discovery will shed any additional light on this issue, so it makes sense for the Court to decide this issue on summary judgment so that the parties can focus the scope of this litigation during discovery and at trial.

## STATEMENT OF FACTS

**Debtor's Assets**

The Debtor was a pharmaceutical company that developed and commercialized drugs focusing on the treatment of drug-resistant bacterial infections. Debtor had developed two drugs for this purpose: (1) an IV anti-infective drug known as ZEMDRI® ("Plazomicin"), which received FDA approval in June 2018; and (2) an orally administered treatment for urinary tract infections caused by drug-resistant bacteria known as "C-Scape" ("C-Scape"), which was in the Phase I approval process when Debtor filed for bankruptcy.[2] This dispute centers around Debtor's sale of these two assets.

---

[2] Phase I is early stage in the FDA approval process, which includes three research phases before FDA review for approval to go to market. *See* https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process.

**The Bankruptcy and Bidding Procedures Order**

Despite receiving FDA approval for Plazomicin for commercial use in or around 2018 and its representations regarding the strong demand for the drug, Debtor alleges to have been unable to capitalize on the product and found itself mired in a liquidity crisis. As a result, Debtor filed for Chapter 11 relief on April 15, 2019.

Following its entry into Chapter 11, Debtor sought to auction both its Plazomicin and C-Scape assets. To that end, the Court entered an order [D.I. 123] (the "<u>Bidding Procedures Order</u>") approving the bidding procedures [D.I. 123-1] (the "<u>Bidding Procedures</u>") proposed by Debtor. *See also* Compl., Ex. B. The Bidding Procedures, drafted by Debtors, provide in unambiguous terms that "if the Successful Bidder fails to consummate the Sale . . . the Successful Bidder's (other than the Stalking Horse Bidder, as applicable) Good Faith Deposit shall be forfeited to the Debtor as liquidated damages in accordance with the terms of such agreement . . . ." Bidding Procedures, Section X (Failure to Consummate Purchase). The same cap was applied to any back-up bidder that likewise failed to consummate the sale. *Id.* Debtor chose to expressly limit its recovery to those deposits. In stark contrast, and in the very same provision, Debtor more broadly reserved "all of its rights and remedies" in the event the *Stalking Horse Bidder* failed to consummate, applicable only if the Stalking Horse was the successful bidder.[3] *Id.* In other words, Debtor specifically chose to restrict its remedies through a damages cap for any successful bidder or back-up bidder while reserving broader remedies as to any Stalking Horse Bidder.

**The June 3, 2019 Auction**

On June 3, 2019, Achaogen commenced an auction (the "<u>June 3 Auction</u>") for all of its non-C-Scape assets. Compl., ¶ 24. At the June 3 Auction, Cipla submitted an initial bid for the

---

[3] There was no Stalking Horse Bidder in this proceeding.

global rights to Plazomicin (the "Global Rights"). Compl., ¶ 25 and Ex. C. While no party outbid Cipla for the Global Rights, non-party Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") submitted a bid for a license to develop, commercialize, and manufacture Plazomicin in the regions of China, Hong Kong, Macau, and Taiwan (the "China Assets"). *Id.*, ¶ 26 and Ex. D. Achaogen took the position that these split bids collectively constituted an offer for the Global Rights that was higher than Cipla's bid. Compl., ¶ 28. As a result, Cipla was forced to split its bid for Plazomicin into two bids: one for the Global Rights, less the China Assets, and one for the China Assets themselves. *Id.*

After multiple rounds of bidding at the June 3 Auction, Cipla was the successful bidder for the Global Rights, subject to an acceptable license agreement with Qilu for the China Assets, and Qilu was deemed the successful bidder for the China Assets. Compl., ¶ 30. Cipla was deemed the back-up bidder for the China Assets ("Back-Up Bidder"). *Id.*

**The Plazomicin Sale Agreement and Sale Order**

Following the June 3 Auction and negotiations among the parties, Cipla and Debtor entered into an Asset Purchase Agreement dated as of June 20, 2019 (the "Plazomicin Sale Agreement"), by which Cipla would purchase the Global Rights, less the China Assets which would be licensed to Qilu pursuant to an acceptable license agreement. *Id.*, ¶ 34 and Ex. E.[4]

The Plazomicin Sale Agreement further ratifies the cap provided in the Bidding Procedures Order. Specifically, the Plazomicin Sale Agreement provides that "the purchaser delivered an additional $350,000 in advance of the [June 3] Auction which is subject to the Purchaser's obligations with respect to the Bidding Procedures in connection with the China License Agreement, as back-up bidder thereunder." Plazomicin Sale Agreement, Section 2.6. The

---

[4] Plaintiff's claims do not arise from the Global Rights.

4

Plazomicin Sale Agreement unambiguously provides that the ***sole and exclusive remedy*** in the event of a breach by Cipla for failure to consummate the deal for the China Assets is the release of the $350,000 deposit already paid by Cipla. Plazomicin Sale Agreement, §§ 7.2(a) and (b) ("[T]he forfeiture of the Deposit as liquidated damages shall be the ***sole and exclusive remedy*** … if either (i) the Purchaser fails to consummate the sale as the result of a breach by the Purchaser . . . .") (emphasis added). Finally, the Plazomicin Sale Agreement contains a standard "entire agreement" clause which notes that the contract "constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement." *Id.*, § 10.4.

Following the entry into the Plazomicin Sale Agreement, on July 23, 2019, the Court entered an Order approving the sale of the Global Rights, minus the China Assets (the "Cipla Sale Order"). Compl., ¶ 64 and Ex. K.

**Cipla Negotiates in Good Faith, but Debtor Allows Qilu to Walk Away.**[5]

After entry into the Plazomicin Sale Agreement, Cipla attempted to engage in good faith negotiations with Qilu and Debtor to finalize an acceptable Qilu license agreement. As the Complaint acknowledges, Cipla provided comments on a draft license agreement on June 17, 2019. Compl., ¶ 37. Discovery will show that on June 21, 2019, counsel for the parties conferred regarding the draft and Cipla was open to potential revisions from Qilu.

Cipla, however, never received any counterproposals to its draft. Rather, in July of 2019, Qilu began indicating that it was walking away from the transaction (*see* Compl. at ¶ 66), and on July 29, 2019, Qilu "determined to walk away from the transaction." *Id.*, ¶¶ 65-66.[6] It was thus

---
[5] Cipla provides the factual background in this section for context, but none of the facts in this section are determinative for the purposes of this Motion.
[6] Accordingly, Plaintiff does not allege that Qilu entered into a license agreement for the China Assets. *See, e.g.,* Compl., ¶ 131 ("Achaogen was unable to reach agreement with Qilu on the Qilu License Agreement…").

5

apparent that any Qilu license agreement would not be consummated by October 15, 2019, or at any time. For reasons unknown, *Debtor* failed to engage, and does not allege to have engaged, in any steps to push Qilu to stay at the table to consummate the license agreement and facilitate the deal as it admits it was required to do. This was a necessary component of the Cipla Sale Order and the Plazomicin Sale Agreement.

On July 30, 2019, Cipla likewise informed Debtor that it would not be closing on the China Assets either, as "there were characterizations made to it by Achaogen representatives both before and during the course of the [June 3] Auction regarding the potential value of the [China Assets] which were incorrect." Compl., ¶ 69, Ex. M.

Therefore, Cipla formally withdrew its bid to purchase the China Assets and on July 31, 2019, informed the Court of that fact. *Id.*, ¶¶ 69, 72.

**The C-Scape Assets and Sale Agreement**

Separately from the Global Rights and the China Assets for Plazomicin, Debtor held an auction for C-Scape on June 12, 2019 (the "June 12 Auction"). Compl., ¶ 41. At the June 12 Auction, Cipla was the successful bidder. *Id.*, ¶ 43. Eight days later, belying Plaintiff's claim that Cipla treated its winning bid as "little more than a placeholder," Cipla and Achaogen entered into a second Asset Purchase Agreement dated as of June 20, 2019 (the "C-Scape Sale Agreement"). Compl., ¶¶ 44-45, Ex. G.

Importantly, like the Plazomicin Sale Agreement, the C-Scape Sale Agreement contained a liquidated damages provision capping liability at the Deposit—$50,000 (§ 7.2(b)) and entire agreement provision superseding and voiding all prior agreements, including any oral contracts (§ 10.4).

While not material for the purposes of this Motion, the C-Scape Sale Agreement contained multiple representations and warranties of Achaogen. *Id.*, Ex. G, Art. 3. The C-Scape Sale Agreement permitted Cipla to terminate the agreement for, among other reasons, the failure of any covenant by Debtor, including the failure to close by the Outside Date. *Id.*, § 7.1(a)(ii). Plaintiff admits that closing of the C-Scape Sale Agreement did not take place by the Outside Date, thereby permitting Cipla to terminate pursuant to Section 7.1(a)(ii). Compl., ¶¶ 164-165. Thereafter, Cipla exercised its contractual right and terminated the C-Scape Sale Agreement. *Id.*, ¶ 166.

## **ARGUMENT**

The purpose of summary judgment is to conserve judicial and party resources by streamlining the issues for trial. *See Coffman v. Federal Laboratories*, 171 F.2d 94, 98 n.11 (3d Cir. 1948); Fed. R. Civ. P. 56, advisory committee note of 1963. Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine dispute of material fact exists only if a reasonable trier of fact could enter a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court's role is to "determine whether there is a genuine issue for trial." *Id.* at 249. In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). When a movant's evidence demonstrates the lack of a genuine issue of material fact, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 327.

Here, the interpretation of the contractual limitations on liability are purely questions of law, and the plain language of the contracts provides that damages are capped at the applicable

deposits. *See Alcoa, Inc. v. Alcan Rolled Products-Ravenswood LLC*, 2020 WL 1180713, at *2 (D. Del. Mar. 11, 2020) ("It is a fundamental principle of contract law that disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment") (quoting *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001); *see Tamarind Resort Assocs. v. Virgin Islands*, 138 F.3d 107, 110-11 (3d Cir. 1998); *see also Citisteel USA, Inc. v. General Elec. Co.*, 78 Fed.Appx. 832, 835 (3d Cir. 2003) ("Determining whether a contract provision is ambiguous is a question of law. Absent ambiguity, a court enforces a contract as written[.]"). As such, Cipla is entitled to summary judgment as to the applicability of the liability caps. *Wolfington*, 935 F.3d at 195.

### I. <u>Cipla's Liability for the China Assets is Capped at its $350,000 Deposit</u>

Plaintiff's claim for damages from the China Assets transaction stems from Cipla's obligations as Back-up Bidder for the China Assets. The Bidding Procedures provide that following entry of an order approving the sale of the China Assets, the deposit will be treated as liquidated damages in the event that the successful bidder or back-up bidder fails to consummate the sale. *See* Bidding Procedures, Section X. This Court approved a sale of the China Assets. *See In re Achaogen Inc.*, Case No. 19-10844, D.I. 574 (Bankr. D. Del. Jan. 9, 2020). Tellingly, unlike the treatment of the Back-up Bidder, the Bidding Procedures broadly reserved to the Debtor *all* of its rights and remedies (not just the deposit) if the Stalking Horse Bidder became the successful bidder. *Id.* The Bidding Procedures, which were not drafted by Cipla, are facially clear that Debtor knew how to limit its damages in one instance (as to the Back-up Bidder) and in the other to expressly reserve *all* rights and remedies (as to the Stalking Horse Bidder). As such, it is clear that even if the Court were to find that Cipla was liable for damages arising from the China Assets

transaction (it is not), Cipla's liability is limited to its deposit of $350,000 as contemplated by Debtor's own Bidding Procedures.

The Plazomicin Sale Agreement also limits any recovery to the deposit. Section 2.6 of the Plazomicin Sale Agreement discusses both the $700,000 deposit that would constitute liquidated damages in the event of a breach of the Plazomicin Sale Agreement for the Global Rights, minus the China Assets **and** the $350,000 deposit for Cipla's obligations under the Bidding Procedures as the Back-up Bidder for the China Assets. Sections 7.2(a) & (b) of the Plazomicin Sale Agreement make clear that in the event Cipla breached the agreement, then the deposit shall be treated as liquidated damages and is the ***sole and exclusive remedy***.

The import of the language in these documents is clear and unambiguous, damages are capped. Indeed, Delaware and bankruptcy courts routinely deny requests for damages in excess of an applicable liquidated damages provision. *See Delaware Limousine Serv., Inc.v Royal Limousine Serv., Inc.*, 1991 WL 53449, at *2 (Del. Super. Apr. 5, 1991) ("where parties have stipulated as to damages in a liquidated damages provision, the amount stipulated represents the outer limit of the non-breaching party's recovery."); *In re Klemen*, 22 B.R. 757, 761 (Bankr. N.D. Ill. 1982) (denying trustee's demand for deficiency judgment in excess of earnest money where contract for sale of property stated that earnest money "shall" become liquidated damages in the event the sale did not consummate); *In re Governor's Island*, 45 B.R. 247, 257 (Bankr. E.D.N.C. 1984) ("Liquidated damage clauses have become regularly used and frequently upheld provisions in bankruptcy sales…. The language contained in the agreement, prepared by the plaintiffs' agent … is clear and unambiguous. 'If the balance is not paid when due, deposit *shall* be retained by seller as liquidated damages.'"); *Zemenco, Inc. v. Developers Diversified Realty Corp.*, 205 Fed. App'x. 82, 86 (3d Cir. 2006) (applying Pennsylvania law, but in accord with Delaware law,

9

"Parties who agree to a proper liquidated damages clause cannot later claim entitlement to actual damages."). The Court should similarly find here that, regardless of which contract or document is considered, Cipla's only possible liability in this matter related to the China Assets is the release of its $350,000 deposit.

## II. Cipla's Liability for C-Scape is Capped at its $50,000 Deposit

Section 2.3 of the C-Scape Sale Agreement provides that "[t]he parties acknowledge that the Purchaser previously delivered a good faith deposit to the Seller … equal to $50,000…." *See* Compl., Ex. G. Section 7.2(b) of the C-Scape Sale Agreement provides that "if the Purchaser fails to consummate the sale as the result of a breach by the Purchaser of any of its obligations under this Agreement, the Deposit shall be forfeited to the Seller as liquidated damages." *Id*. Therefore, it is clear that Cipla's maximum liability for any breach of the C-Scape Sale Agreement is forfeiture of its $50,000 deposit.

To the extent the Plaintiff argues that the liquidated damages clause requires entry of an order of the Court approving the C-Scape Sale Agreement in order to be effective, that argument is inconsistent with its argument that the C-Scape Sale Agreement is a binding contract. *See* Compl., ¶163. The Plaintiff cannot on one hand claim that the C-Scape Sale Agreement is a "valid and binding contract," except for the portion on liquidated damages that it now regrets drafting and agreeing to. *See Id*. *Cf. Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 264 (3d Cir. 2000) ("Bankruptcy law generally does not permit a debtor or an estate to assume the benefits of a contract and reject the unfavorable aspects of the same contract.").

### III. Plaintiff is Not Saved by the Tortious Interference Claims

Perhaps realizing the contractual language in all the relevant documents caps its recovery, Plaintiff includes claims for tortious interference. This is likely so Plaintiff can argue that any cap on damages has no bearing on intentional torts, such as interfering with Qilu's purchase of the China Assets. It is generally true that "a provision for liquidated damages does not prevent the recovery of actual damages caused by events that are not covered by the liquidated damages clause, unless the contract expressly provides that damages other than those enumerated shall not be recovered." *Delaware Limousine Serv., Inc. v. Royal Limousine Serv., Inc.*, 1991 WL 53449, at *2 (Del. Super. Ct. Apr. 5, 1991). But this general principle does not provide a basis around the caps here. The Plazomicin Sale Agreement states in unambiguous terms that the deposit is the ***sole and exclusive*** remedy. Plazomicin Sale Agreement, Section 7.2(a). Where, as is the case here, a contract "specifies a remedy for breach of that contract, the Court of Chancery is not prohibited from awarding other equitable or legal remedies, at least ***unless the [contract] explicitly states that the specified remedy is the exclusive remedy***." *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) (emphasis added).

Further, Section X of the Bidding Procedures covers this current dispute. Section X specifically and broadly covers the situation where the sale is not consummated—which is what occurred here. In such a case, the Bidding Procedures are clear that the ***sole remedy*** is the deposit. To avoid any doubt, Section X specifically permits additional remedies—they simply do not apply here (i.e., relating to a stalking horse bidder which never occurred). It must be noted that Debtors drafted the Bidding Procedures, not Cipla. As such, Plaintiff cannot avoid this proposal because he simply does not like the outcome. Nor can Plaintiff attempt to use artful pleadings by alleging a tort claim to surmount the clear and unambiguous liability caps. In light of the plain limiting

11

language as well as express expansion of rights in Section X, the liquidated damages clauses cover the dispute at issue, and therefore cap the damages at the deposits.

## **CONCLUSION**

For the reasons stated herein, Cipla respectfully requests the Court enter an Order granting Cipla partial summary judgment as to liability.

| | |
|---|---|
| Dated: February 15, 2024<br>Wilmington, Delaware | Respectfully submitted,<br><br>*/s/ Jesse L. Noa*<br>Jeremy W. Ryan (No. 4057)<br>John A. Sensing (No. 5232)<br>Jesse L. Noa (No. 5973)<br>Andrew L. Brown (No. 6766)<br>**POTTER ANDERSON & CORROON LLP**<br>1313 N. Market Street, 6th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 984-6000<br>Facsimile: (302) 658-1192<br>Email: jryan@potteranderson.com<br>      jsensing@potteranderson.com<br>      jnoa@potteranderson.com<br>      abrown@potteranderson.com<br><br>*Attorneys for Cipla USA, Inc.* |