## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Achaogen, Inc., | Case No. 19-10844 (BLS) |
| Debtor.[1] | |
| | |
| Edward E. Neiger, not individually but as Plan Trustee of the Achaogen Plan Trust, | Adv. Pro. No. 21-50479 (BLS) |
| Plaintiff | |
| v. | |
| Cipla USA Inc., | |
| Defendant. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY FILED BY CIPLA USA INC.

Justin R. Alberto (No. 5126)
Andrew Roth-Moore (No. 5988)
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Email: jalberto@coleschotz.com
        aroth-moore@coleschotz.com

Nicholas C. Brown, Esq. (admitted *pro hac vice*)
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (651) 289-3846
Fax: (651) 406-9676
Email: nbrown@askllp.com

*Counsel for Edward E. Neiger, in his capacity as Plan Trustee of the Achaogen Plan Trust*

Dated: March 15, 2024
Wilmington, Delaware

---

[1] The last four digits of Achaogen's federal tax identification number are 3693. The last four digits of the Achaogen Plan Trust's tax identification number are 4172.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………….…………………………….………………...iii

SUMMARY OF ARGUMENT…………………………………………….……..………...1

STATEMENT OF RELEVANT FACTS…………………………………….………………1

ARGUMENT……………………………………………………………….…………..5

    A.  The Bidding Procedures Do Not Restrict Plaintiff's Damages…………..……………6

    B.  Similarly, the Plazomicin Sale Agreement Does Not Impair Plaintiff's Remedies Arising from Cipla's Failure to Purchase the China Assets…………………………...9

    C.  The Cases Cited by Defendant are Distinguishable…………………………………11

    D.  Even if the Liquidated Damages Clauses in the Bidding Procedures and Plazomicin Sale Agreement Applied to Plaintiff's Contractual Claims, Plaintiff's Claims for Tortious Interference and Other Non-Contractual Relief are Not Impacted…………12

    E.  The Liquidated Damages Clause in the C-Scape Sale Agreement is Similarly Inapplicable to Plaintiff's Claims……………………………………………………15

CONCLUSION …………………………………………………………………………16

**TABLE OF AUTHORITIES**

**Cases**

*Anthony P. Miller, Inc. v. Wilmington Housing Authority*,
    165 F. Supp. 275 (D. Del. 1958) …..……………..……………………………………14

*Ballenger v. Applied Digital Solutions, Inc.*,
    Case No. Civ.A. 19399, 2002 WL 749162 (Del. Ch. Apr. 24, 2002) …..……….……… 6

*CRS Proppants LLC v. Preferred Resin Holding Company, LLC*,
    2016 WL 6094167 (Del. Super. Sept. 27, 2016) ……..………...……………….………12

*DCR Inc. v. Peak Alarm Co.*,
    663 P.2d 433, 435 (Utah 1983) ……………………..……………………12, 13

*Delaware Limousine Service, Inc. v. Royal Limousine Service, Inc.*,
    1991 WL 53449 (Del. Super. Apr. 5, 1991) …………………………………….………13

*Flint & Walling Manufacturing Co. v. Beckett*,
    167 Ind. 491, 79 N.E. 503 (1906) …………………………………….………………13

*J.A. Jones Const. Co. v. City of Dover*,
    372 A.2d 540, 545 (Del. Super. Ct. 1977) ………….……………………………………14

*S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*,
    1997 WL 817883 (Del. Super. Ct. May 21, 1997) ………..……………….……………12

*Tameny v. Atlantic Richfield Co.*,
    27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) ………..……………….………12-13

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
    763 F.3d 273 (3d Cir. 2014) …………………………..……….....……….….…………5, 6

**Secondary Sources**

22 Am.Jur.2d Damages §§ 726, 728 ……………..…..…………………….…….…..13

Blacks Law Dictionary 353 (5th ed. 1979)…………………………………….…….…..12

Restatement [Second] of Contracts § 195 [1] ……………………………………….…...14

Edward E. Neiger, in his capacity as Plan Trustee ("Trustee" or "Plaintiff") of the Achaogen Plan Trust, hereby files this Memorandum of Law in support of his response (the "Response") to the *Motion for Partial Summary Judgment as to Liability* (the "Motion for Partial Summary Judgment")[2] filed by Cipla USA Inc. ("Defendant" or "Cipla"). In support of his Response, the Trustee hereby respectfully shows as follows:

## SUMMARY OF ARGUMENT

This adversary proceeding seeks recompense in the form of actual damages for the failure of Cipla to consummate asset purchases following its designation as successful bidder in two different bankruptcy auctions, as well as Cipla's interference with a third party's efforts to purchase the same assets. Through its Motion for Partial Summary Judgment, Cipla asks the Court to limit damages to the amount of its previously-paid deposits. Cipla argues that placing a "cap" on the amount of Plaintiff's maximum recovery is necessary due to the presence of liquidated damages clauses in certain agreements related to Cipla's aborted transactions. However, a review of these provisions reveals that the opposite result is warranted. Nothing in the agreements cited by Cipla inhibits Plaintiff's pursuit of damages arising from Cipla's contractual breaches and tortious conduct.

## STATEMENT OF RELEVANT FACTS

1. On April 15, 2019, Achaogen, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[3]

---

[2]    Adv. Pro. D.I. 9.

[3]    Complaint ¶ 1.

1

2.     The Debtor was a pharmaceutical company in the business of developing and commercializing certain drugs to fight bacterial infections.[4]

3.     On May 1, 2019, the Court entered an order approving bidding procedures (the "Bidding Procedures") to allow the Detor to auction substantially all of its assets.[5]

Auction of Plazomicin Rights

4.     On June 3, 2019, the Debtor commenced an auction to sell the rights to a drug known as plazomicin.[6]

5.     Cipla submitted an initial bid (the "Initial Bid") for the rights to plazomicin, which bid served as the baseline bid at auction.[7]

6.     During the auction, a third party, Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") submitted a bid for the rights to plazomicin exclusive to the region of China, Hong Kong, Macau and Taiwan (the "China Assets").[8]

7.     Following multiple rounds of bidding, at the conclusion of the auction, Cipla was designated as the successful bidder for the global rights to plazomicin subject to a license agreement for the China Assets (such rights, excluding the rights to the China Assets, hereafter referred to as the "Non-China Assets").

---

[4]   Complaint ¶ 10.

[5]   Complaint ¶ 19, Ex. B.

[6]   Complaint ¶ 24-25.

[7]   Complaint ¶ 25.

[8]   Complaint ¶ 26, Ex. D.

8.     The Debtor and Cipla memorialized their agreement for the sale of the Non-China Assets to Cipla by executing an asset purchase agreement on June 20, 2019 (the "Plazomicin Sale Agreement").[9]

9.     Although Cipla also bid on the China Assets, Cipla was outbid by Qilu. Thus, Qilu was designated as the successful bidder for the China Assets, and Cipla was designated as the back-up bidder for the China Assets.[10]

### Auction of C-Scape Rights

10.     On June 12, 2019, the Debtor conducted an auction to sell the rights to a drug known as C-Scape.[11]

11.     At the conclusion of the June 12, 2019 auction, Cipla was designated the successful bidder.[12]

12.     On June 20, 2019, the Debtor and Cipla memorialized their agreement to sell C-Scape to Cipla by executing an asset purchase agreement (the "C-Scape Sale Agreement").[13]

### Court Approves Sale of Non-China Assets

13.     On July 23, 2019, the Court approved the Debtor's sale of the Non-China Assets to Cipla, as set forth in the *Order (I) Approving the Sale of Certain Assets of the Debtor to Cipla USA Inc. Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption*

---

[9]    Complaint ¶ 34, Ex. E.

[10]   Complaint ¶ 30.

[11]   Complaint ¶ 41.

[12]   Complaint ¶ 43.

[13]   Complaint ¶ 45, Ex. G.

*and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief.*[14]

Cipla Repudiates Bid for the China Assets

14.     On July 22, 2019, Qilu informed the Debtor that Qilu was no longer interested in purchasing the China Assets.  Qilu cited the difficulties Cipla was creating in their negotiations over a license agreement, its belief that Cipla had not been acting in good faith, and its incurred and anticipated costs in connection with negotiations, as the primary factors for its desire to walk away from the transaction.[15]

15.     On July 25, 2019, after learning of Qilu's decision not to go forward with the China Assets transaction, the Debtor informed Cipla that, in accordance with the Bidding Procedures and the results of the auction, Cipla was deemed the successful bidder for the China Assets.[16]

16.     On July 30 and July 31, 2019, Cipla informed the Debtor that it refused to close on the China Assets.[17]

Cipla Fails to Complete the Purchase of C-Scape

17.     On or about July 24, 2019, Cipla alerted the Debtor that it would no longer be going forward with purchasing C-Scape.[18]

---

[14]   Complaint ¶ 64, Ex. K.

[15]   Complaint ¶ 65.

[16]   Complaint ¶ 67-68.

[17]   Complaint ¶ 69, 72, Ex. M.

[18]   Complaint ¶ 57.

18.     On May 29, 2020, the Court entered an order confirming the Debtor's chapter 11 plan of liquidation (the "Plan").[19]

19.     In accordance with the Plan, the Achaogen Plan Trust was established and Plaintiff was appointed as the Plan Trustee.

20.     On May 27, 2021, Plaintiff commenced the above-captioned adversary proceeding (the "Adversary Proceeding").  The complaint contains various claims for relief including claims for breach of contract, tortious interference, and contempt.

21.     On January 30, 2023, the Court entered a *Memorandum Opinion* and corresponding order denying Defendant's motion to dismiss with respect to all counts except for Count IV.[20]

22.     On June 22, 2023, Plaintiff and Defendant commenced mediation.  The parties were unable to reach a resolution at mediation.

23.     On January 16, 2024, the Court entered the *Stipulation and Revised Scheduling Order* which provides in part for the opportunity for Cipla, prior to completing discovery, to file a motion for partial summary judgment on the limited issue of whether Plaintiff's available damages are limited by one or more liquidated damages clauses.[21]

24.     On February 15, 2024, Cipla filed the Motion for Partial Summary Judgment.

## **ARGUMENT**

Liquidated damages clauses in contracts are generally enforceable under Delaware law. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 291 (3d Cir. 2014).  However, such clauses

---

[19]     Docket No. 697.

[20]     Docket No. 893.

[21]     Adv. Docket No. 37.

must be clear and unambiguous. *Id.* The effect of a liquidated damages provision "must have been the unambiguous intention of the contracting parties." *Id.* (citing *Ballenger v. Applied Digital Solutions, Inc.,* Case No. Civ.A. 19399, 2002 WL 749162, at *12 (Del. Ch. Apr. 24, 2002)). Thus, to determine whether a contractual provision is an enforceable liquidated damages clause, Delaware courts ask whether the provision unambiguously demonstrates the parties' intention to set a fixed amount to be paid in the event of breach. *Id.*

A.  The Bidding Procedures Do Not Restrict Plaintiff's Damages.

Cipla argues that Section X of the Bidding Procedures imposes a ceiling of $350,000 on Plaintiff's available damages for Cipla's failure to purchase the China Assets, which sum is the amount of Cipla's deposit for the China Assets.[22] However, the express terms of Section X's liquidated damages clause render it inapplicable to Plaintiff's claims against Cipla. Section X reads in pertinent part:

X.  Failure to Consummate Purchase

***Following entry by the Bankruptcy Court of an order authorizing the Sale to the Successful Bidder***, if the Successful Bidder fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder of its obligations under its Qualified Bidder Purchase Agreement, the Successful Bidder's (other than the Stalking Horse Bidder, as applicable) Good Faith Deposit shall be forfeited to the Debtor as liquidated damages in accordance with the terms of such agreement, and if the Successful Bidder is the Stalking Horse Bidder, as applicable, the Debtor shall have the right to pursue all of its rights and remedies against the Stalking Horse Bidder in accordance with the terms of such Stalking Horse Bidder Purchase Agreement, as applicable. If the Back-Up Bidder is later designated by the Debtor to be the Successful Bidder, the foregoing shall be read to apply to the Back-Up Bidder (and its guarantors, if any) in its capacity as the Successful Bidder. (Emphasis added).

Section X begins by instructing that it is only effective "(f)ollowing entry by the Bankruptcy Court of an order authorizing the Sale to the Successful Bidder . . . ." However, Cipla

---

[22]  *See* Plazomicin Sale Agreement, § 2.6.

rescinded its bid to purchase the China Assets before the Court ever approved a sale. In fact, no

order authorizing a sale of the China Assets to Cipla was ever entered. The only order authorizing

a sale of the China Assets was that Order entered on January 9, 2020, months after Cipla backed

out of its purchase obligations, authorizing a sale to XuanZhu (HK) Biopharmaceutical Limited.[23]

Because an order approving the sale of the China Assets to Cipla does not exist, it follows that

Section X's liquidated damages clause cannot impair the estate's remedies for Cipla's failure to

purchase the China Assets (or its interference with a third party's unsuccessful efforts to purchase

the China Assets).

In addition, Section X of the Bidding Procedures dictates that the parties must look to the

underlying "Qualified Bidder Purchase Agreement" to determine the scope of the liquidated

damages clause. Section X reads in pertinent part:

> If the Successful Bidder fails to consummate the Sale, ***and such failure is the result of a breach by the Successful Bidder of its obligations under its Qualified Bidder Purchase Agreement***, the Successful Bidder's . . . Good Faith Deposit shall be forfeited to the Debtor as liquidated damages ***in accordance with the terms of such agreement*** . . . . (Emphasis added.)

As used in Section X, the term "Qualified Bidder Purchase Agreement" refers to the asset purchase

agreement that accompanied the Initial Bid executed by Cipla and submitted in advance of the

plazomicin auction.[24] The Qualified Bidder Purchase Agreement is attached to the Complaint as

**Exhibit C**.

Section 7.2 of the Qualified Bidder Purchase Agreement reads in pertinent part:

> (a) . . . in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply

---

[23]  Complaint ¶¶ 77-79; Docket No. 574.

[24]  Bidding Procedures, Art. IV.A.F (Docket No. 123-1, pp. 6-7 of 18).

with its obligations under this Agreement, ***the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.***

(b) ***Without in any way limiting the foregoing***, following entry by the Bankruptcy Court of an order authorizing the sale to the Purchaser either as the Successful Bidder or Back-Up Bidder, if the Purchaser fails to consummate the sale as the result of a material breach by the Purchaser of any of its obligations under this Agreement, the Deposit shall be forfeited to the Sellers as liquidated damages.

(Emphasis added.)

The language in Cipla's Qualified Bidder Purchase Agreement reserves for the benefit of the non-breaching party "all legal rights and remedies." Thus, the forfeiture of deposit is not an exclusive remedy. Moreover, the application of this liquidated damages clause is limited, just like that in the Bidding Procedures, to situations following entry of an order approving a sale to Cipla (which never occurred). It follows that Plaintiff's legal remedies against Cipla are not hindered by the Bidding Procedures.

Defendant argues that the provision in Section X expressly reserving all rights against a prospective stalking horse bidder must mean that the Debtor did not intend to reserve all rights against other bidders such as Cipla. In actuality, the exception for stalking horse bidders in Section X merely operates to preserve whatever rights the Debtor would have been able to negotiate in a purchase agreement with a stalking horse bidder. As stalking horse bidders are typically in a position to negotiate heightened bid protections and other favorable terms such as waiving the requirement for a deposit, and because no stalking horse purchase agreement was in place at the time of the Bidding Procedures, it was logical for the Debtor to refrain from setting forth its remedies vis-à-vis a potential stalking horse bidder in the Bidding Procedures.

In summary, Section X of the Bidding Procedures is inapplicable by its express terms to Plaintiff's claims against Cipla. Nothing in Section X prevents or reduces the ability of the Plan Trustee from recovering damages against Cipla to the maximum extent permitted by law.

B. Similarly, the Plazomicin Sale Agreement Does Not Impair Plaintiff's Remedies Arising from Cipla's Failure to Purchase the China Assets.

Cipla also relies on language in the Plazomicin Sale Agreement to argue that Plaintiff's damages are limited to the amount of Cipla's deposit. Defendant points to section 7.2, which states in relevant part:

Section 7.2  Effect of Termination

(a)  If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 5.7 (*Public Announcements*), Section 5.12 (*Back-Up Bidder*), ARTICLE 10 (*General Provisions*) (except for Section 10.11 (*Specific Performance*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing, but except as contemplated in Section 7.2(b) below (in which case the forfeiture of the Deposit as liquidated damages shall be the sole and exclusive remedy), in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

(b)  Following entry by the Bankruptcy Court of an order authorizing the sale to the Purchaser either as the Successful Bidder or Back-Up Bidder, the Deposit shall be forfeited to the Seller as liquidated damages if either (i) the Purchaser fails to consummate the sale as the result of a breach by the Purchaser of any of its obligations under this Agreement or (ii) this Agreement is terminated pursuant to Section 7.1(a)(vi); provided, that the Seller is not in material breach of its obligations under Section 5.17(f).

At the outset, Plaintiff's choice of title for the "Plazomicin Sale Agreement" is somewhat misleading. The Plazomicin Sale Agreement, dated June 20, 2019, memorialized the sale to Cipla of the ***Non-China Assets***. That is, the China Assets were not purchased under the Plazomicin Sale

9

Agreement.  For example, the purchase price under the Plazomicin Sale Agreement represents the consideration paid for the Non-China Assets, and the defined term "Deposit" refers to Cipla's deposit for the Non-China Assets.[25]  In fact, it would have been illogical to include the China Assets among the purchased assets when, at the time of the Plazomicin Sale Agreement, Qilu (not Cipla) was the successful bidder for the China Assets.[26]  Cipla's separate efforts to purchase the China Assets required a distinct contract or amendment to the Plazomicin Sale Agreement, neither of which was ever executed.[27]

The claims arising in this Adversary Proceeding relate to Cipla's failure to purchase the China Assets, rather than Cipla's consummated purchase of the Non-China Assets.  Thus, the liquidated damages clause in the Plazomicin Sale Agreement has no bearing on Plaintiff's remedies for misconduct arising from the failed China Assets transaction.

Even if the liquidated damages in Section 7.2 of the Plazomicin Sale Agreement were relevant to the China Assets transaction, such clause could only apply, by its express terms, in the event that the Plazomicin Sale Agreement were terminated.  Section 7.2 is entitled "Effect of Termination".  Section 7.2(a) begins with "If this Agreement is terminated . . . ."  Section 7.2(b)

---

[25]  Plazomicin Sale Agreement § 2.6.  Section 2.6 of the Plazomicin Sale Agreement defines "Deposit" as the $700,000 deposit for the Non-China Assets.   Section 2.6 makes reference to an "additional $350,000" in connection with the China Assets, but that sum is not encompassed in the definition of "Deposit" and is therefore not incorporated in Section 7.2(b)'s liquidated damages clause.

[26]  Complaint ¶ 67 ("After learning that Qilu was unlikely to follow through on its obligations as Successful Bidder for the China Assets, on July 25, 2019 Achaogen informed Cipla that it would have the opportunity to consummate the purchase of the China Assets . . .").

[27]  Article 2.1 of the Plazomicin Sale Agreement provides that the "Purchased Assets" are subject to the "China License Rights."  The order approving the Plazomicin Sale Agreement states, "If the ownership of the Greater China Assets is conveyed to [Cipla] as the Back-up Bidder, such conveyance will be effected through an amendment to the Sale Agreement or similar agreement or instrument between Buyer and the Debtor, pursuant to which [Cipla's] ownership rights to the Purchased Assets identified in the Sale Agreement will no longer be subject to any third party license for the Territory."  Complaint, Ex. K (Docket No. 371, p. 20 of 53).

provides that the liquidated damages clause is only effective in the event of a failure to consummate or termination of the Plazomicin Sale Agreement.

The liquidated damages clause in Section 7.2 is not applicable to Plaintiff's claims because the Plazomicin Sale Agreement was never terminated. Unlike its failure to complete purchases of the China Assets and C-Scape, Cipla closed on its purchase of the Non-China Assets, which on information and belief it continues to own presently. Because the Debtor and Cipla closed on their transaction for the Non-China Assets, Cipla did not "fail to consummate the sale" or otherwise satisfy a prerequisite necessary for enforcing the liquidated damages clause in Section 7.2 of the Plazomicin Sale Agreement.

In summary, because the Plazomicin Sale Agreement constitutes an agreement to purchase the ***Non-China Assets***, rather than the ***China Assets***, the liquidated damages clause in the Plazomicin Sale Agreement does not control Plaintiff's remedies for Cipla's misconduct surrounding the China Assets.

C. The Cases Cited by Defendant are Distinguishable.

Cipla relies on several cases in which bankruptcy courts have upheld liquidated damages clauses to restrict the amount of available damages.[28] However, the language in the clauses discussed in Parts A and B, *supra*, are distinguishable from the language relied on in Cipla's cases. Unlike the contracts in the cited cases, the Bidding Procedures and Plazomicin Sale Agreement contain qualifying language and conditions which limit the scope of the liquidated damages clauses. Section X of the Bidding Procedures cannot control the amount of available damages against Cipla because no order approving a sale of the China Assets to Cipla was ever entered.

---

[28] *See* Cipla Memorandum of Law, Adv. Docket No. 39, page 13 of 16.

Further, the liquidated damages clause in the Plazomicin Sale Agreement does not apply because such agreement was never terminated. Defendant correctly emphasizes that liquidated damages clauses will be enforced when they are clear and unambiguous. However, the clauses relied on by Defendant in the case at bar condition their application on the occurrence of events which did not occur.

D. <u>Even if the Liquidated Damages Clauses in the Bidding Procedures and Plazomicin Sale Agreement Applied to Plaintiff's Contractual Claims, Plaintiff's Claims for Tortious Interference and Other Non-Contractual Relief are Not Impacted.</u>

As a general rule, a liquidated damages clause pertains to damages for breach of the underlying contract. "Liquidated damages is the amount the parties to a contract have agreed, at the time of entering into the contract, will satisfy any loss or injury flowing from ***a breach of their contract***." *CRS Proppants LLC v. Preferred Resin Holding Company, LLC*, 2016 WL 6094167 (Del. Super. Sept. 27, 2016) (emphasis added). "It is, in effect, the parties' best guess of the amount of injury that would be sustained ***in a contractual breach***, a way of rendering certain and definite damages which would otherwise be uncertain or not easily susceptible of proof." *S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at *2 (Del. Super. Ct. May 21, 1997) (emphasis added). *See* Blacks Law Dictionary 353 (5th ed. 1979) (Liquidated damages are "the amount of damages (that) has been expressly stipulated by the parties to a ... contract as the amount of damages to be recovered by either party ***for a breach of the agreement by the other***.") (Emphasis added).

However, the mere existence of a contractual relationship does not preclude claims for tort relief. *See, e.g., DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983) ("A party who breaches his duty of due care toward another may be found liable to the other in tort, even where the relationship giving rise to such a duty originates in a contract between the parties."); *Tameny*

*v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) ("[A] wrongful act committed in the course of a contractual relationship may afford both tort and contractual relief, and in such circumstances the existence of the contractual relationship will not bar the injured party from pursuing redress in tort."); *Flint & Walling Manufacturing Co. v. Beckett,* 167 Ind. 491, 79 N.E. 503, 505, 506 (1906).

Absent express language excluding liability in tort, a liquidated damages clause will not extend to a contracting party's claims for tortious conduct. *See Delaware Limousine Service, Inc. v. Royal Limousine Service, Inc.*, 1991 WL 53449 (Del. Super. Apr. 5, 1991) (citing 22 Am.Jur.2d Damages §§ 726, 728) ("[a] provision for liquidated damages does not prevent the recovery of actual damages caused by events that are not covered by the liquidated damages clause, unless the contract expressly provides that damages other than those enumerated shall not be recovered.") Thus, damages will not be capped where the liquidated damages clause does not "anticipate the events that actually occurred" or "preclude actual damages outside [its] terms." *Id.* at *2; *DCR Inc. v. Peak Alarm Co.*, 663 P.2d at 435.

Whereas Plaintiff relies on breach of contract principles for Counts I – III in the Complaint, Plaintiff has brought additional claims arising from Cipla's failed purchase of the China Assets for tortious interference (Counts V – IV), breach of the implied covenant of good faith and fair dealing (Count IX) and contempt (Count X). These claims are resistant to the restrictions on contractual damages appearing in the Bidding Procedures and Plazomicin Sale Agreement because the liquidated damages clauses do not incorporate liability for tortious conduct or other non-contractual remedies.

Because damages associated with non-contractual claims are not expressly contemplated by their liquidated damages clauses, neither the Bidding Procedures nor the Plazomicin Sale

13

Agreement prevents Plaintiff from seeking damages against Cipla in excess of its deposit, including for tortious interference and contempt.

Defendant seizes on the phrase "sole and exclusive remedy" appearing in Section 7.2 of the Plazomicin Sale Agreement as evidence that all claims of any kind should be subject to its liquidated damages clause. However, as explained in Part B, *supra*, that liquidated damages clause does not apply to Plaintiff's claims because the Plazomicin Sale Agreement was never terminated. Moreover, it would be nonsensical to limit Plaintiff's damages for misconduct arising from the failed China Assets transaction to the amount of Cipla's deposit for the completed Non-China Assets transaction. Meanwhile, the words "sole" and "exclusive" do not appear anywhere in Section X of the Bidding Procedures. Thus, there is no language in either the Plazomicin Sale Agreement or Bidding Procedures that would expand the scope of their liquidated damages clauses to include non-contractual claims such as tortious interference.

Even if the parties had expressly attempted to restrict Cipla's liability for tort, such provision would be unenforceable as a matter of public policy. Restatement [Second] of Contracts § 195 [1] ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."); *J.A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) (a contract purporting to give general exoneration from 'damages' will not protect a party from a claim involving tortious conduct); *Anthony P. Miller, Inc. v. Wilmington Housing Authority*, 165 F. Supp. 275 (D. Del. 1958) ("no damages" clause not applicable to claims arising from fraud, evil intent, improper motive or willfulness amounting to bad faith).

Thus, the liquidated damages clauses appearing in the Plazomicin Sale Agreement and Bidding Procedures have no impact on Plaintiff's remedies for non-contractual claims including tortious interference and contempt.

E. The Liquidated Damages Clause in the C-Scape Sale Agreement is Similarly Inapplicable to Plaintiff's Claims.

In addition to Cipla's misconduct regarding the China Assets, Cipla also breached its agreement to purchase C-Scape. Plaintiff asserts three counts against Cipla in connection with its failure to purchase C-Scape: Count VII (breach of contract); Count VIII (promissory estoppel); and Count IX (breach of implied covenant of good faith and fair dealing). In response, Defendant points to a liquidated damages clause residing in the Cipla C-Scape Agreement.

Section 7.2 of the C-Scape Agreement reads as follows:

Section 7.2 Effect of Termination.

(a) If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 5.2 (*Public Announcements*), Section 5.6 (*Back-Up Bidder*), Article 10 (*General Provisions*) (except for Section 10.11 (*Specific Performance*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing, in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, ***the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired***.

(b) ***Without in any way limiting the foregoing***, ***following entry by the Bankruptcy Court of an order authorizing the sale to the Purchaser*** either as the Successful Bidder or Back-Up Bidder, if the Purchaser fails to consummate the sale as the result of a breach by the Purchaser of any of its obligations under this Agreement, the Deposit shall be forfeited to the Seller as liquidated damages.

(Emphasis added).

15

A plain reading of Section 7.2 dictates that Cipla cannot restrict Plaintiff's damages to the amount of the deposit. Section 7.2(b) conditions its application upon "entry by the Bankruptcy Court of an order authorizing the sale to the Purchaser". However, no sale order was ever entered for C-Scape.[29] Just as it did with the China Assets, Cipla backed out of its commitment to purchase C-Scape before the sale could be approved by the Court. In fact, Cipla's delay and ultimate refusal to follow through on the C-Scape transaction resulted in C-Scape losing significant value to the point that it has become unsalable.[30] In addition, Section 7.2 reserves for Plaintiff "all legal rights and remedies hereunder and under applicable Law" which are not "in any way limit[ed]" by the liquidated damages clause.

Based on the plain language in the C-Scape Sale Agreement and the principle that a liquidated damages clause must be clear and unambiguous, Cipla cannot establish that the liquidated damages clause in Section 7.2 of the C-Scape Sale Agreement protects Cipla under the facts in this case.

## CONCLUSION

While courts have displayed a general willingness to uphold liquidated damages clauses in contracts, such clauses will only be applied to the extent they are clear and unambiguous. Here, Cipla cannot show that the liquidated damages clauses in Section X of the Bidding Procedures, Section 7.2 of the Plazomicin Sale Agreement, or Section 7.2 of the C-Scape Sale Agreement unambiguously restrict Plaintiff's remedies for Cipla's failure to consummate transactions for the China Assets and C-Scape. Even absent their qualifying language and unmet prerequisites for

---

[29]   Plaintiff does not argue that the Cipla Sale Agreement is not a binding agreement absent an order approving the sale. Rather, the express terms of the Cipla Sale Agreement dictate that the liquidated damages clause itself was contingent upon entry of a court order, which did not occur.

[30]   Complaint ¶¶ 80-81.

enforcement, the liquidated damages clauses do not cover Plaintiff's non-contractual remedies for tortious interference or contempt.  Cipla made its proverbial bed by participating substantially in the bankruptcy auction process only to later repudiate its commitments as successful bidder and force another purchaser to rescind its purchase obligation.  Cipla must face the consequences for its actions in the form of actual damages resulting from its misconduct.

*[The remainder of the page is intentionally blank.]*

WHEREFORE, Plaintiff requests that the Partial Motion for Summary Judgment be denied in its entirety, and for such other and further relief as the Court deems just and proper.

March 15, 2024
Wilmington, Delaware

**COLE SCHOTZ P.C.**

By: /s/ *Justin R. Alberto*
Justin R. Alberto, Esq. (No. 5126)
Andrew Roth-Moore, Esq. (No. 5988)
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Email: jalberto@coleschotz.com
        aroth-moore@coleschotz.com

*-and-*

Nicholas C. Brown, Esq., NC SBN 38054
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (877) 746-4275
Fax: (651) 406-9676
Email: nbrown@askllp.com

*-and-*

Edward E. Neiger, Esq.
ASK LLP
60 East 42nd Street, 46th Fl.
New York, New York  10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

*Counsel for Edward E. Neiger, in his Capacity as Plan Trustee of the Achaogen Plan Trust*